642 So.2d 901 (1994)
Betty Jean CARROW
v.
Jimmie Rogers CARROW.
No. 92-CA-00516.
Supreme Court of Mississippi.
September 8, 1994.
Claude V. Bilbo, Jr., Henry P. Pate, III, Pascagoula, for appellant.
William T. Reed, Oswald and Reed, Pascagoula, for appellee.
Before PRATHER, P.J., and SULLIVAN and JAMES L. ROBERTS, Jr., JJ.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION.
In this appeal from the Chancery Court of Jackson County, Mississippi, the Appellant, Betty Jean Carrow (Jean), was granted a divorce from her husband of 29 years, Jimmie Rogers Carrow (Jimmie), on the ground of habitual cruel and inhuman treatment. However, she was not granted an equitable distribution of the couple's property as she had requested. Jean then filed a motion to reconsider which was subsequently denied. Aggrieved by the rulings of the chancery court, Jean filed her notice of appeal, to this Court assigning as error the following:
THE CHANCELLOR AWARDED A DIVORCE TO APPELLANT WIFE FROM A 29 YEAR MARRIAGE BUT REFUSED TO MAKE AN EQUITABLE DISTRIBUTION. DOES APPELLANT WIFE'S POST SEPARATION ADULTERY ESTOP APPELLANT WIFE FROM AN "EQUITABLE DISTRIBUTION" OF MARITAL ASSETS?

*902 II. STATEMENT OF THE FACTS.
Jean and Jimmie met in high school when Jean was 15 years old and dated throughout high school. The two were married in Washington, North Carolina, on October 21, 1962. At the time they were married, the couple had no assets at all. Their only child, Charlotte Victoria Carrow (Vickie), was born on October 22, 1965.
The couple moved to Norfolk, Virginia. Jimmie worked at the Norfolk Naval Shipyard, and Jean worked at a restaurant. They moved to Mississippi in October of 1969. When they first moved to Mississippi, Jean worked as the head cashier at Gibson's Department Store. She then went to work for Ingalls Shipbuilding and has worked there for over 20 years. Her current gross annual salary is $38,181.33. She also has a substantial amount of accumulated retirement. Jimmie works as a chief planner at a Naval Air Station and earns an annual salary of $47,238.00. Jimmie has approximately $44,000.00 built up in retirement benefits with the civil service. After moving to Mississippi, Jean and Jimmie bought a home located on the Old Mobile Highway in 1970 or 1971. They then bought a home on Forts Lake Road in Pascagoula in 1975. As will be discussed in detail later, Jimmie has extensive collections of Chevrolet Corvette automobiles and guns. At first the Corvette collection seemed to be a hobby, but later Jimmie determined that the automobiles would be a good investment for his and Jean's retirement.
On April 16, 1980, Jimmie purchased a piece of commercial property on Martin Street. Jimmie testified that he bought the Martin Street property for the purpose of opening a Corvette museum. However, Jimmie never opened a museum and instead opened an automobile parts store called Southern Auto Parts. Later, on December 15, 1983, Jimmie bought another piece of commercial property. This property was located on Market Street. Jimmie opened another parts store, Southern Auto Parts 2, at this location. Jean worked in the parts store on afternoons and on Sundays for about six months. Jean worked there until Jimmie brought his mother and her husband in to operate the business. Jean was never compensated for any of her work in the parts store. Their daughter, Vickie, also worked in the parts stores for about four years. Jean's name was not on either of the deeds for the two pieces of commercial property because she said, "He just didn't want my name on there, on any of them." Jimmie eventually closed his parts business. After Jimmie closed the parts store, Jean opened a lounge in the Martin Street property. To get the money to buy the inventory and merchandise for the lounge, Jean took out a $5,000.00 loan from the Sunburst Bank. She used one of her cars as collateral for this loan. Jean testified that her lounge paid its bills, but did not ever make a profit. She did not pay Jimmie rent for the building, but said that he told her not to do so until "it gets on its feet and you can afford to pay." However, she did say that if the lounge had made a profit Jimmie would have gotten half of it. Jean closed her lounge after operating it for about two years. Jean said that Jimmie moved and sold the inventory and merchandise remaining in the lounge after it was closed. Jimmie testified that he worked in Jean's lounge without being paid.
In December of 1984, Jimmie purchased a house in Grand Bay, Alabama. Jean's name was never placed on the deed to this home. Jean and Vickie moved into this home in 1985; however, Jimmie remained in Pascagoula. Jimmie said the reason that he stayed in the Forts Lake home was because he wanted people to know that someone was there. Jimmie did later move into the Grand Bay home with Jean in 1986 or 1987.
The couple separated from each other in early May of 1989. Jean returned to the Forts Lake home to live with Vickie.[1] They even met with Jimmie's attorney about a possible no-fault divorce. Jean said that she did not go through with the divorce in 1989 because of the property.
*903 Shortly after her separation from Jimmie in May of 1989, she had an affair with Dennis Pierce. This affair lasted about four months.
After moving back in to the Forts Lake home, Jimmie told Jean that she would have to pay $315.00 per month in rent. Jean paid this for three months. Thereafter, she moved into the Vandywood Apartments. She lived there for about six months. The couple then reconciled in February or March of 1990 and attempted to make their marriage work. However, even though they were reconciled, they still lived in separate houses. Jimmie lived in Grand Bay and Jean lived in the Forts Lake home.
On May 21, 1990, Jimmie conveyed his interest in the Forts Lake home to Jean by a Quitclaim Deed. Jimmie said that he gave Jean the choice of either the Grand Bay home or the Forts Lake home, and she chose the latter. Jimmie had previously made an oral agreement with the bank that when the Forts Lake house was sold, he would pay the bank $22,000.00. Before giving her the quitclaim deed, Jimmie made Jean sign a piece of paper in which she promised to pay him $22,000.00. This agreement was apparently never recorded. Jean borrowed $16,000.00 from the Sunburst Bank, and used part of this money to rework the house with Jimmie helping her do this work.
The couple separated for the final time on November 1, 1990. Jean continued to live in the Forts Lake home with Vickie. Thereafter, Jean began an affair with Steve Bodin beginning sometime in November, 1990. This affair lasted about a month and a half. She then had an affair with Hezzie A. Wilks Jr. for approximately four to five months beginning in March of 1991. Jimmie first learned of Jean's three affairs at a deposition which was taken on August 21, 1991. Jean claims that her affairs had nothing to do with the dissolution of their marriage. However, Jimmie contends that had he known of Jean's affair with Dennis Pierce he would not have gone back together with her in 1990.
Jean filed a complaint for divorce on April 11, 1991, alleging as grounds habitual cruel and inhuman treatment and also, in the alternative, irreconcilable differences. Along with her complaint, she also filed a petition for protection from domestic abuse. Jimmie answered Jean's complaint generally denying the allegations made by Jean. He also counterclaimed for divorce on the grounds of adultery, habitual cruel and inhuman treatment, and irreconcilable differences. On July 16, 1991, the chancellor entered an order enjoining Jimmie from selling or otherwise disposing of any of the Corvettes in his possession at the time of the separation. Jean filed a motion to amend her complaint on November 19, 1991, asking for a divorce on the grounds of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Among other things, she also requested the following: alimony; attorneys' fees; an equitable interest in the home in Grand Bay, Alabama; exclusive use and possession of the Forts Lake home; one-half of all of Jimmie's retirement benefits; an equitable interest in all real property owned by the parties at the time of the separation; and one-half interest in all Corvettes, parts, and accessories. Jimmie answered this amended complaint on January 31, 1992. Following the trial, the chancellor awarded Jean a divorce from Jimmie on the ground of habitual cruel and inhuman treatment, ending the 29 year marriage.[2] The chancellor held that the handwritten note wherein Jean promised to pay Jimmie the sum of $22,000.00 was not enforceable and that Jean owned the Forts Lake house free and clear of any conditions of that note. The chancellor also ordered Jimmie to pay Jean $5,000.00 for the furniture and fixtures that Jean purchased for her lounge, which Jimmie moved to another location. The chancellor closed his opinion saying, "The Plaintiff [Jean] is not entitled to any further relief." Jean filed a motion to reconsider which was denied on April 13, 1992. Jean thereafter filed her notice of appeal to this Court.

III. ANALYSIS.

THE CHANCELLOR AWARDED A DIVORCE TO APPELLANT WIFE FROM A 29 YEAR MARRIAGE BUT REFUSED TO MAKE AN EQUITABLE *904 DISTRIBUTION. DOES APPELLANT WIFE'S POST SEPARATION ADULTERY ESTOP APPELLANT WIFE FROM AN "EQUITABLE DISTRIBUTION" OF MARITAL ASSETS?
Within this assignment of error, Jean contends that the chancellor erred in failing to order an equitable distribution of the couple's property, specifically the two pieces of commercial property and the collection of Corvettes. The standard of review that this Court employs on appeals from chancery courts is limited. A chancellor's decision will be upheld if it is supported by substantial credible evidence. Hammett v. Woods, 602 So.2d 825, 827 (Miss. 1992) (citing Clark v. Myrick, 523 So.2d 79, 80 (Miss. 1988)). Also, "This Court will not disturb the findings of a Chancellor unless the Chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Bell v. Parker, 563 So.2d 594, 596-97 (Miss. 1990).
In the instant case the chancellor placed an undue emphasis on Jean's adulterous activities in making his ruling. Jean's affairs occurred during periods in which she was separated from Jimmie, and the chancellor did not make a finding of what effect the affairs had to with the deterioration of this marriage, if anything. In his opinion, the chancellor stated:
The Plaintiff admitted that she had an adulterous relationship with a man after the May, 1989, separation and that she did not tell Defendant about same prior to or during the attempted reconciliation. She also admitted two other such relationships which occurred after the November, 1990, separation.
The Plaintiff presented sufficient proof regarding the Defendant's conduct prior to the May, 1989 separation to be granted a divorce on the grounds of Habitual Cruel and Inhuman Treatement (sic). The adulterous conduct of the Plaintiff immediately after May, 1989, was not condoned by the Defendant. That fact, along with similar conduct after the November, 1990 separation prevents her from being granted any relief other than hereinafter stated. (Emphasis added).
The relief the chancellor referred to was that Jean was given title to the Forts Lake house (the home Jimmie quitclaim deeded to her in 1990) clear of the indebtedness that she had promised to pay Jimmie of $22,000.00. Also, the chancellor ordered that Jimmie pay Jean $5,000.00 for the furniture and fixtures that Jean had purchased for her lounge.
This Court has held that adultery should not per se preclude a spouse from receiving alimony, saying, "adultery should not stand as an absolute bar to alimony, especially, we believe, when denial of alimony would render the wife destitute." Hammonds v. Hammonds, 597 So.2d 653, 655 (Miss. 1992). In addition, in considering an award of alimony, fault or misconduct of one of the parties is only one of several factors to be taken into account. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss. 1993). See Hammonds, 597 So.2d at 655. This Court recently expanded this concept to the division of marital property in Chamblee v. Chamblee, 637 So.2d 850 (Miss. 1994). In Chamblee, this Court said:
In recent years, this Court has been moving away from using divorce proceedings as a means of punishing the party adjudged to be at fault toward creating a more fair and equitable jurisprudence of divorce law. This trend can be seen in the area of child custody in the many non-fault based factors listed in Albright. Furthermore, Moak v. Moak, 631 So.2d 196, 1992 Miss.Lexis 842 (Miss. 1994), states specifically that "child custody decisions are to be made in the best interests of the children, rather than as punishment." Id., 631 So.2d at 200, at 5. Alimony is likewise not to be used as a punishment. Tilley v. Tilley, 610 So.2d 348, 354 (Miss. 1992). In view of the recent case law, it seems likely that this Court must use a similar attitude of equity and non-punishment towards the division of marital property.

Chamblee, 637 So.2d at 863 (emphasis added). It is difficult to adjust conventional values of morality when weighing marital misconduct for purposes of a just division of marital property. However, marital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct *905 places a burden on the stability and harmony of the marital and family relationship. See Ferguson v. Ferguson, 639 So.2d 921, 927 (Miss. 1994). Thus, the chancellor erred in holding that Jean's adulterous conduct precluded her from being entitled to any form of equitable distribution of the property upon divorce. In addition, this case must also be considered in light of this Court's recent case of Ferguson, which deals with the issue of equitable distribution and also provides guidelines for the division of marital property, as well as, Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss. 1994), which defines "marital assets as any and all property acquired or accumulated during the marriage."
Jean testified that during their marriage, she was responsible for paying nearly all of the family's household type expenses. These expenses included: the electric bill, telephone bill, gas bill, groceries, doctor's expenses, medication, household supplies, clothing for all three members of the family, swimming pool supplies, day care, car payments, car tags, car insurance, car maintenance, and presents. In addition, Jean testified that she bought all of the household furnishings with the exception of two bedroom suites and a refrigerator. Jean said the more money that she made, the more she had to spend on expenses. Jimmie also admitted that Jean paid for most of these types of expenses.
Jean stated that she feels that through her paying all of these expenses she thereby allowed Jimmie to use more of his money for investments. Jimmie testified that he paid for the house note and the house insurance. Jimmie also said that he thought he paid for Vickie's school tuition. However, in addition to paying for the above items, Jean performed many domestic type services for the family. She did the grocery shopping, the housework, washed the family's clothes, mowed the yard, and cleaned the swimming pool and hot tub.
Among the major items that Jean argues should be equitably distributed are the two pieces of commercial property purchased by Jimmie. In her amended complaint for divorce, Jean prayed for "a legal and equitable interest in all real property owned by the parties at time of separation." Jimmie bought the property on Martin Street in 1980 and purchased the property located on Market Street in 1983.[3] Jean's name was not on any of the deeds to these two pieces of commercial property. Jean did not pay any of the mortgage payments, taxes, or insurance on these properties. These were paid by Jimmie. Jimmie opened up automotive parts stores at these two locations. Jean worked in the parts store on and off for approximately six months, but received no compensation for her efforts. However, Jimmie was similarly uncompensated for working in Jean's lounge. Jimmie now receives $525.00 per month in rent on the Martin Street property, but pays a light bill of about $100.00 per month for security purposes. He also receives $800.00 per month in rent from the Market Street property. The Martin Street property was appraised in 1988 to have a value of $130,000.00. Jimmie currently still owes $85,000.00 on this property. Jimmie's Market Street property was appraised in 1983. This appraisal placed the property's value at $132,000.00. Jimmie stills owes $15,000.00 on this piece of property. However, Jimmie testified that he has tried to sell these properties at prices below their appraised values and no one has purchased them.
The other major item that Jean contends should have been equitably distributed by the chancellor below was the collection of Corvette automobiles. In her amended complaint for divorce, Jean asked that she be awarded "a one-half interest in all Corvettes, parts and accessories." Jean basis her argument on the fact that she paid the majority of the household bills and expenses. She contends that, by paying these expenses, she allowed Jimmie to use his money to invest in these Corvettes. By doing this, she said she feels as if she put money into the Corvettes just as Jimmie did. It is not disputed by either party that at the time of their separation, Jimmie had quite a collection of Corvettes.[4] *906 Jimmie purchased his first Corvette in 1972. At one time Jimmie owned 46 Corvettes, but has dealt with between 70 and 100 in his tradings. All of the Corvettes are in Jimmie's name except for two which are in Jean's name. Jimmie said that he initially started buying Corvettes as a hobby, but as the prices of these cars started going up, he determined that they might be a good investment for their retirement. Jean testified that even though the Corvettes were in Jimmie's name, she trusted him because he told her the purpose of owning these cars was to build income for their retirement. Jean said that she was involved in about fifty percent (50%) of the Corvette purchases. She also said that she had worked on the Corvettes, sanding and fiberglassing some of them. Jimmie acknowledged that Jean helped with the Corvettes, but stated that she did very little. Jimmie valued his entire Corvette collection at $396,000.00. However, this appraisal was prepared by Jimmie for a possible buyer and he said that these are inflated values. In Ferguson, 639 So.2d at 929, this Court emphasized that after classifying property as marital, separate, (or fixed) assets a valuation of assets would be necessary in order for the trial court to adequately arrive at a fair division of marital properties.[5] Again, Jean considered these Corvettes to be an investment in their retirement and contends that she contributed to this investment by paying the vast majority of the family's household expenses. Finally, their daughter Vickie testified that Jimmie stated that the Corvettes were for his and Jean's retirement.
In Ferguson and in Hemsley, this Court reiterated the fact that chancery courts of this state have the authority and power to equitably divide a couple's marital assets upon divorce. Ferguson, 639 So.2d at 927. See Hemsley, 639 So.2d at 914; Draper v. Draper, 627 So.2d 302, 305 (Miss. 1993); Brown v. Brown, 574 So.2d 688, 690 (Miss. 1990); Jones v. Jones, 532 So.2d 574, 580-81 (Miss. 1988). In Johnson v. Johnson, 550 So.2d 416, 420 (Miss. 1989), this Court stated, "the Chancery Court certainly has the authority to order an equitable division of jointly accumulated property and in doing so to look behind the formal state of title." Johnson, 550 So.2d at 420. See Ferguson, 639 So.2d at 927; Hemsley, 639 So.2d at 913. This principle was expanded in the recent decision of Draper v. Draper in which this Court held that the chancellor has the power to divest title to real property from one spouse and vest it in the other. Draper, 627 So.2d at 305. As Ferguson notes, "fairness is the prevailing guideline in marital division." Ferguson, 639 So.2d at 929.
This Court later stated:
We define marital property for the purpose of divorce as being any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor. We assume for divorce purposes that the contributions and efforts of the marital partners whether economic, domestic or otherwise are of equal value.
Hemsley, 639 So.2d at 915.
Ferguson also noted that unfairness and unjust property distributions may result upon divorce "[i]n a family where both spouses worked, but the husband's resources were devoted to investments while the wife's earnings were devoted to family expenses or vice versa." Ferguson, 639 So.2d at 926. This appears to be such a situation where Jean appears to have paid most, if not all, of the family's household type expenses, including purchasing the vast majority of their home's furnishings. She also did a great deal of "domestic" work in the home. Thus, by Jean's working in the home and by her paying a great deal of the family's expenses, she thereby allowed Jimmie to utilize more of his money for the purchase of investments (i.e. the Corvettes and the commercial property). However, this does not mean that Jean is entitled to one-half of the parties' property.

*907 It is well-established by this Court that the chancery court has the authority to order an equitable division of property that was accumulated through the joint efforts and contributions of the parties. Brown v. Brown, 574 So.2d 688, 690 (Miss. 1990). However, there is no automatic right to an equal division of jointly-accumulated property, but rather, the division is left to the discretion of the court. Id. at 691.
Draper, 627 So.2d at 305 (emphasis added). This would seem to be especially true with regard to the Corvettes.
Evidence was also presented that some of the Corvettes may have been purchased by Jimmie with money from his father's estate and with inherited money borrowed from his mother. Property originally acquired by inheritance, devise, or descent is usually treated as separate property. Fields v. Fields, 643 S.W.2d 611, 614 (Mo. App. 1982). While Jean did do some of the work on these cars, it appears that Jimmie did the vast majority of the work on them. Also, it appears that much of the value of these Corvettes came not solely from the purchase of these cars, but from the work and improvements made upon them after they were purchased. Appreciation of the value of any non-marital asset may be taken into account to arrive at a fair division to the extent that the nontitled spouse had made a contribution toward that appreciation of value. See, e.g., Smith v. Smith, 111 N.C. App. 460, 433 S.E.2d 196, 204 (1993). Therefore, Jean should not be automatically entitled to a one-half share, but it does appear that she should be entitled to some portion of the couple's appreciated value of the separate property where the appreciation resulted from the joined efforts, skills or funds of both spouses.
In analyzing the equitable distribution of a divorcing couple's property, this Court, in Ferguson, set forth eight factors which should be utilized by a chancellor as guidelines in making a determination. The chancellor may weigh several factors under Mississippi law, applying them to the facts of this case in reaching a fair distribution of marital property, to be decided by the proper weighing and balancing of all the applicable factors together to arrive at a just division. These factor are:
1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.
Ferguson, 639 So.2d at 928-929.

IV. FINAL ANALYSIS AND CONCLUSION.
While this Court holds that an equitable distribution should be made in the instant case, an equitable distribution cannot be *908 made by this Court on appeal, but must be remanded for a hearing on this matter. The appraisals of value on the disputed items are either out of date or are untrustworthy. The appraisal on the Market Street property was made in 1983 and the appraisal on the Martin Street property was made in 1988. Also, the values placed on the Corvettes seems very unreliable. Therefore, as a result of the chancellor's emphasis on Jean's adulterous activities, the new guidelines set forth in Ferguson v. Ferguson, and the seemingly inequitable results reached in the instant case, this Court holds that the chancellor was manifestly wrong in not making some type of equitable distribution. This case is reversed and remanded to the chancellor for re-evaluation in light of Chamblee v. Chamblee and Ferguson v. Ferguson.
REVERSED AND REMANDED.
SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
McRAE, J., dissents with separate written opinion joined by HAWKINS, C.J., and DAN M. LEE, P.J.
McRAE, Justice, dissenting:
As the majority points out, this Court's scope of review in domestic cases is quite limited. Absent findings by the chancellor that are manifestly wrong or clearly erroneous, we are required to uphold those decisions which are supported by substantial evidence. Hammett v. Woods, 602 So.2d 825, 827 (Miss. 1992). The majority, however, has substituted its perception of "equitable distribution" for that of the chancellor and ordered the case to be remanded to consider the division of two business properties titled in Jimmie Carrow's name as well as his extensive Corvette collection. Moreover, without consideration of the consequences of its ruling or defining what assets might be considered separate property, the majority announces sweeping changes for the treatment of these assets. Accordingly, I dissent.
The majority remands the case for reconsideration in light of the eight factors enumerated in Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994). The chancellor, acting without the benefit of those factors, had already made a distribution of the Carrow's property which generally reflected those factors. Nevertheless, the majority finds him to be manifestly in error, without providing any guidance as to how he might more "equitably" apply the Ferguson factors on remand. Specifically, they leave the chancellor groping in the dark by failing to highlight those factors he might have accorded greater consideration.
There is substantial evidence to support the equity of the division of assets ordered by the chancellor. Little disparity exists between Jean and Jimmie Carrow's incomes and retirement savings plan assets. At the time of the hearing, Jean had an annual income of more than $38,000.00 and retirement assets in excess of $30,000.00. Jimmie's annual income was approximately $47,000.00 with retirement funds of $44,000.00. The chancellor awarded Jean one of the two residential properties owned by the couple, and voided a promissory note of $22,000.00 on the house which Jimmie had made her sign. He further ordered Jimmie to pay Jean $5,000.00 for furniture from a lounge she had owned. In addition to the couple's second house, Jimmie was awarded two business properties titled in his name as well as his car collection. Valuation of these assets is disputed and difficult to establish, illustrating the need for expert testimony in equitable distribution cases.
The chancellor found that because of Jean's adulterous behavior after the couple separated, she was limited to the property settlement outlined in the final judgment. However, despite his finding that Jean presented sufficient evidence of cruel and inhuman treatment to grant her a divorce on those grounds, the chancellor stated:
Perhaps the granting of this relief will help her get on with her life. Even if the Court granted the Defendant [Jimmie] a divorce on the grounds of adultery, the remaining relief granted would be the same.
The conduct of neither party in this case should be condoned. Moreover, Jean's adultery does not serve to offset Jimmie's abuse. Either party could have been granted a divorce on the grounds sought. Today the majority, expanding upon Chamblee v. Chamblee, 637 So.2d 850 (Miss. 1994), totally *909 excises the concepts of conduct or fault from its newly-declared doctrine of equitable distribution. Will we next eliminate fault from the list of factors the chancellor must consider when determining alimony?
Almost as an afterthought, the majority today introduces the notion that couples might have separate property, which, depending upon the circumstances or judicial fiat, may or may not be subject to equitable distribution. We are not provided with a meaningful definition of separate property, as distinguished from the definition of marital property articulated in Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994).[1] However, the majority acknowledges that property acquired by inheritance, devise or descent is usually treated as separate property, presumably even if inherited during the marriage, regardless of the Hemsley definition. It does not advise us what, if any, other property might be deemed separate property. Nevertheless, we are now advised the appreciation in value of any separate property may be taken into consideration and even subject to division should the "non-titled" spouse have contributed to its appreciation. Ironically, no provision is made to penalize a "non-titled" spouse who has acted to dissipate the other's inheritance or otherwise contributes to the depreciation of the other's assets.
The chancellor wisely saw that these people needed to be divorced. Given the circumstances, he has already effected an "equitable distribution" of the couple's property. It is not the role of this Court to second-guess him. We are not super-chancellors; rather, we are bound by our limited scope of review. Furthermore, we should not blithely divest individuals of so-called "separate" property without definition or consideration of the consequences. Accordingly, I dissent.
HAWKINS, C.J., and DAN M. LEE, P.J., join this opinion.
NOTES
[1] This was not the first time that Jean and Jimmie had experienced marital difficulties. The couple separated shortly after they were married in 1963. Also, in 1975 they met with an attorney about a possible divorce.
[2] The granting of the divorce is not contested on this appeal.
[3] Jean testified that this was to be for their retirement, "something to fall back on."
[4] Also, at the time of the parties' separation Jimmie had a substantial collection of firearms.
[5] Observers of Mississippi law have cogently noted such valuation would be no less than "critical." Thomas W. Crockett and J. Randall Patterson, Dividing the Property in a Marital Dissolution, 62 Miss.L.J. 57, 81 (1992)
[1] If, indeed, separate property exists pursuant to the Hemsley definition. Since Hemsley defines marital property to embrace "any and all property acquired or accumulated during the marriage," it would appear that only that property acquired before or after the marriage could be deemed separate property.