# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CT-00567-SCT

*SHIRLEY B. WARING*

*v.*

*RICHARD L. WARING*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT: 5/6/96

TRIAL JUDGE: HON. VICKI R. BARNES

COURT FROM WHICH APPEALED: WARREN COUNTY CHANCERY COURT

ATTORNEY FOR APPELLANT: JOHN E. ELLIS

ATTORNEY FOR APPELLEE: J. MACK VARNER

NATURE OF THE CASE: CIVIL - DOMESTIC RELATIONS

DISPOSITION: REVERSED - 9/9/1999

MOTION FOR REHEARING FILED: 10/07/99; denied 12/02/99

MANDATE ISSUED: 12/09/99

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Richard Waring filed for divorce against Shirley Waring in Warren County Chancery Court in July 1994. The Warings subsequently agreed to divorce on the ground of irreconcilable differences, with

financial issues retained for decision by the chancery court. The chancery court awarded to Shirley sole title to the marital home, lump sum alimony, and rehabilitative alimony for a period of three years. Shirley appealed the final judgment of divorce to this Court, which assigned the case to the Court of Appeals. A divided Court of Appeals reversed the judgment of the chancery court and remanded. *Waring v. Waring*, 722 So. 2d 73 (Miss. Ct. App. 1998). This Court granted Richard Waring's petition for writ of certiorari concerning the issues of equitable distribution and alimony. After due consideration, we reverse the judgment of the Court of Appeals in its entirety.

I.

¶2. The parties were married on October 17, 1987, and separated finally in December 1993. They were not divorced until March 1996. The marriage was Richard's first and Shirley's third. Richard was thirty-two and Shirley was thirty-nine at the time of the marriage. No children were born of the marriage.

¶3. Prior to the marriage, Shirley was a Louisiana resident who supported herself by operating several businesses, including La Club Dijon, a bar, for ten years in New Orleans. She also had owned Metal Coatings, a marine sandblasting business and Shirley Beckham Interiors, an interior design business. La Club Dijon was shut down, and Metal Coatings was sold in contemplation of the marriage. Shirley Beckham Interiors was continued on a part-time basis after the marriage in Vicksburg under the name The Waring Collection, but it did not produce significant income to Shirley.

¶4. Richard was involved in three family-owned businesses. Richard was Vice-President of Waring Oil, which marketed petroleum products. Richard oversaw the thirty-three convenience stores owned and operated by Waring Oil. Waring Oil is a Subchapter S corporation; its shareholders are Richard's cousins, Dan Waring, President, and Howard Waring, Secretary/Treasurer, who each own a 45% share of the business, with Richard owning a 10% share. Richard Waring, Dan Waring and Howard Waring each owned a 33 1/3% share in Neill Gas, a propane gas company. Additionally, Richard, Dan and Howard, along with brother-in-law Bobby Bailess, each own a 25% interest in Three-W, a real estate partnership which leased the land to Waring Oil for convenience store sites.

¶5. Richard was compensated for his efforts in the family businesses by way of salary and periodic distributions of earnings. Richard's disposable income, or income after payment of taxes, was $98,385.80 for 1995 and averaged $84,881.82 for the seven years preceding 1995. These sources of compensation provided essentially the sole source of support for the couple during the marriage. Shirley did not play an active role in the businesses; however, she did become active in a significant way in local politics and served as the first female president of the country club to which the parties belonged. Shirley testified that she did, on occasion, assist in business activities; however, those activities were sporadic.

¶6. Richard's holdings in the family corporations predated the marriage. In addition, he owned a condominium property prior to the marriage. Shirley's separate estate at the time of the marriage consisted of a 1983 Jaguar automobile. In addition, she testified that she received funds in the approximate amount of $5,000 from the sale of one of her businesses and that she contributed those funds to the marriage. At the time of the divorce, Shirley had no separate bank accounts or investments. Richard had, during the marriage, accumulated funds in a retirement account. Richard testified that the account had increased by approximately $30,000 during the marriage. Shirley claimed that Richard's retirement fund had increased by $44,000 during that time.

¶7. The parties had purchased an older home on Confederate Avenue in Vicksburg during their marriage and had spent considerable sums in refurbishing the home. The property had an approximate value of $212,000; however, the property was subject to two mortgages that totaled about $195,000, with monthly payments of about $2,000.

¶8. The family businesses in which Richard was a shareholder and in which he was an active participant had increased substantially in value during the marriage. This increase in value was apparently due, at least in part, to acquisitions of new properties and expansion of the number of convenience stores owned and operated by these corporations. These acquisitions and expansions were partially financed by loans; however, there was also evidence that these business expansions were financed by the profits of the businesses themselves. The parties disputed the amount of the increase in value of the businesses during the marriage. Shirley's expert stated that Richard's holdings in the family businesses had increased in value from $668,101 at the time of the marriage to approximately $4,000,000 at the time of the divorce.

¶9. The couples' joint federal tax return for 1994 showed an adjusted gross income before taxes of $424,639. In 1993, the couple's adjusted gross income was $409,396. In addition, Richard was furnished an automobile through the family businesses.

¶10. Shirley testified to monthly living expenses of $7,563. The chancellor determined that a more reasonable expense estimate was $4,213. Richard testified to living expenses of $1,406.

¶11. The chancery court found that Shirley should be awarded the Confederate Avenue home in Vicksburg and that she would be responsible for the mortgages on the home. The court divided the couple's personal property. The court ordered that Richard pay to Shirley $4200 per month for twelve months and $3700 per month for the subsequent twenty-four months as rehabilitative periodic alimony. Shirley was awarded one half of Richard's retirement benefits. Richard was ordered to pay $10,000 in attorney fees and $3,000 in accountant (expert witness) fees. The court declined to award Shirley an equitable distribution of Richard's assets in the family businesses based on appreciation of the value of the assets during the marriage because Shirley had not shown that her efforts had directly contributed to the appreciation.

¶12. On appeal a divided Court of Appeals reversed and remanded. The Court of Appeals majority found that "the chancellor should have taken into consideration, for purposes of equitable distribution or some alternate form of award in lieu of an in-kind distribution, the part of the increase in value of Mr. Waring's share of these family-owned businesses that was fairly attributable to the active efforts of either of the parties during the marriage." 722 So. 2d at 726. The Court of Appeals stated that this did not have to be through a share of the increased wealth, but could be through distributions of property or alimony. *Id*. at 727. The Court of Appeals went on to reverse and remand the chancery court's award of attorney's fees and suit fees and to award Mrs. Waring $5,000 in attorney's fees and suit fees on appeal. **Id**. at 728-29.

II.

¶13. In a domestic case, this Court "will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard." *Johnson v. Johnson*, 650 So.2d 1281, 1285 (Miss. 1994).

¶14. This Court has provided the following basic rules on equitable distribution:

The division of marital assets is governed by the guidelines delineated in *Johnson*, *Ferguson*, and

*Hemsley*. The first step is to identify the character of the parties' assets, both marital and nonmarital, pursuant to *Hemsley*. *Johnson*, 650 So.2d at 1287. The chancellor should then, in light of each party's nonmarital property, employ the *Ferguson* factors as guidelines and equitably divide the property. *Id.* The Court instructed the chancellor to do no more "[i]f there are sufficient marital assets which, when equitably divided and considered with each spouse's nonmarital assets, will adequately provide for both parties...." *Id.* However, "[i]f the situation is such that an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party, then alimony based on the value of nonmarital assets should be considered." *Id.*

*Knutson v. Knutson*, 704 So.2d 1331, 1333 (Miss. 1997).

¶15. Two recent decisions we find particularly applicable are *Carrow v. Carrow*, 642 So.2d 901 (Miss. 1994), and *Carrow v. Carrow*, No. 97-CA-00713-SCT, 1999 WL 33877 (Miss. Jan. 28, 1999). *Carrow* involved a twenty-nine year marriage, where the wife was initially not granted an equitable distribution of marital property, specifically two pieces of commercial property in Pascagoula and a collection of antique Corvette automobiles. Both parties had worked and made good salaries during the marriage, particularly in the years since moving to Mississippi. It was admitted that throughout the marriage Jean Carrow paid most of the marital household expenses and performed many domestic services, allowing Jimmie to use his income for investments. This Court in considering the matter

define[d] marital property for the purpose of divorce as being any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of marriage are marital assets and are subject to an equitable distribution by the chancellor. We assume for divorce purposes that the contributions and efforts of the marital partners whether economic, domestic or otherwise are of equal value.

*Carrow*, 642 So.2d at 906 (quoting *Hemsley v. Hemsley*, 639 So.2d 909, 915 (Miss. 1994)).

¶16. This Court further stated in *Carrow*, 642 So.2d at 907:

Evidence was also presented that some of the Corvettes may have been purchased by Jimmie with money from his father's estate and with inherited money borrowed from his mother. Property originally acquired by inheritance, devise, or descent is usually treated as separate property. *Fields v. Fields*, 643 S.W.2d 611, 614 (Mo.App.1982). While Jean did do some of the work on these cars, it appears that Jimmie did the vast majority of the work on them. Also, it appears that much of the value of these Corvettes came not solely from the purchase of these cars, but from the work and improvements made upon them after they were purchased. Appreciation of the value of any non-marital asset may be taken into account to arrive at a fair division to the extent that the non-titled spouse had made a contribution toward that appreciation of value. *See, e.g., Smith v. Smith*, 111 N.C.App. 460, 433 S.E.2d 196, 204 (1993). Therefore, Jean should not be automatically entitled to a one-half share, but it does appear that she should be entitled to some portion of the couple's appreciated value of the separate property where the appreciation resulted from the joined efforts, skills or funds of both spouses.

On remand Jean was awarded a one-half interest in both pieces of commercial property, and a substantial part of the Corvette collection. This Court affirmed this award in the second *Carrow* decision.

¶17. The chancery court in this case considered the eight factors as provided under *Ferguson v. Ferguson*, 639 So.2d 921, 928 (Miss. 1994), for equitable distribution of marital property, specifically, Richard's assets in Waring Oil, Neill Gas and Three-W. We find that one possible equitable result of the analysis is that a distribution may be denied. The chancery court found that Shirley Waring's contribution would fall under Factor 1, indirect economic contribution to the acquisition of the property. As far as business efforts Shirley argued that she contributed to the businesses in two ways: by her actions on behalf of the businesses, and by agreeing to reinvestment of the couple's income in the companies. Shirley stated that she regularly took phone calls and relayed them to Richard; that if she were in one of the convenience stores and noticed a problem, she relayed that to Richard; that she renovated some offices and sold Venetian blinds to the businesses; developed a country store theme for the store across from the National Military Park and suggested that a tent be installed over the counter at the store; orchestrated a party for approximately 100 business contacts; and accompanied Richard on business trips. The chancery court found that "[w]hile these contributions are not large, they should not be totally discounted." The court noted that both parties agreed that Shirley contributed in this manner, such as becoming active in the local country club and the local Republican group. The chancery court added: "Her involvement in those two organizations benefitted both parties in terms of increased opportunities for business and personal contacts."

¶18. The chancery court then undertook a detailed analysis of Subchapter S corporations in order to determine whether the couples' income was actually reinvested in the family businesses. The court found that no more of Richard's earnings than necessary were reinvested in the convenience stores, a competitive and capital intensive business. The chancery court ultimately found, relying on *Carrow* and *Smith*:

> There was no testimony elicited from the Defendant's case assigning any economic value to Mrs. Waring's contributions, if any. The burden was on the Defendant to prove by a preponderance of the evidence not merely that the Plaintiff's stock value increased, but also that the increase was due to active appreciation, including, though not limited to, the Defendant's chosen contribution to the marriage, as recognized in the factors enumerated in *Ferguson*. Absent that proof, this court may only award alimony.

Under the applicable standard of review, this finding is not clearly erroneous and should have been affirmed by the Court of Appeals.

¶19. This Court has stated that while alimony and equitable distribution should be considered together, they are distinct concepts, and when one expands the other must recede. *Ferguson*, 639 So.2d at 929. As the chancery court properly declined to award an equitable distribution of Richard's business interest, it made the following awards to Shirley: rehabilitative periodic alimony, the marital home, one-half of Richard's retirement, and attorney's fees and expert witness fees. After review and in light of our decisions in *Armstrong v. Armstrong*, 618 So.2d 1278 (Miss. 1993), and *Tilley v. Tilley*, 610 So.2d 348 (Miss. 1992), we find that the awards, in both form and amount, should have been affirmed by the Court of Appeals.

¶20. Given our conclusion that the Court of appeals erred in its disposition of these issues, it necessarily follows that we conclude that the Court of Appeals erred in both reversing and remanding the chancery court's award of attorney's fees and suit fees and in awarding attorney's fees on appeal to Mrs. Waring.

¶21. For these reasons, we reverse the judgment of the Court of Appeals in its entirety with the result that

the judgment of the Warren County Chancery Court is reinstated and affirmed.

¶22. **REVERSED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, SMITH, AND WALLER, JJ., CONCUR. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

### COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶23. I concur with all but one aspect of the majority's opinion. I write separately to **emphasize** that the chancery court, in equitably distributing the assets in this case, did not totally discount Mrs. Waring's contributions to the appreciation of value of Mr. Waring's business interests, as the majority opinion seems to imply.

¶24. After reciting in detail Mrs. Waring's various contributions to the businesses, which included those specifically set forth in the majority opinion, the chancery court stated "[w]hile these contributions are not large, they should not be totally discounted. While Mrs. Waring did not work outside the home, she made her contributions to the marital estate in the manner she had chosen and with which Mr. Waring apparently agreed." **(Chancery Ct. Op. at 10)** After giving a detailed analysis of the appreciation of the value of Mr. Waring's business interests during the marriage, the trial court found that "... alimony, rather than a division of assets in the form of corporate shares or their equivalent, is appropriate." **Id.** at 17. This alternate form of award in lieu of an in-kind distribution does not mean that the court declined to award any equitable distribution of Mr. Waring's business interest, as the majority opinion states. Owning a small percentage of interest in any business established and operated by an ex-husband's family would create unnecessary entanglements following the divorce. The award of alimony is simply a more appropriate method.

¶25. I respectfully dissent from the majority's affirmance of the award of only three years of rehabilitative periodic alimony. Given Mrs. Waring's age (47 at the time of divorce in 1996), and the number of prime years during which she removed herself from the work force in order to undertake the various activities and responsibilities of the marriage, the award should have been for a longer period of years.