BRIDGES, C.J.,
for the Court:
¶ 1. Thomas Monroe Arnold and Lorene Arnold Hanson have appealed from an order of the Scott County Chancery Court in which the chancellor found Albert Arnold and Marie Arnold presented clear and convincing evidence to rebut the presumption that they exerted undue influence over Ola Arnold to execute a general power of attorney naming Albert Arnold as her attorney-in-fact and ultimately to convey Ola Arnold’s one-ninth interest in 120 acres of land to Marie Arnold. Finding sufficient evidence to support the chancellor’s con-elusion, we affirm.
FACTS
¶2. At the center of this family feud involving siblings Tom, Lorene and Albert is a one-ninth undivided interest in 120 acres of land.
¶ 3. In February 18, 1944, Dock Arnold died intestate leaving 120 acres[1] of Scott County land to Ola Arnold, his widow, and their nine children as tenants in common. Born to Dock and Ola Arnold were Myrtle Arnold Lauderdale, Henry Wilson Arnold, Lorene Arnold Hanson, Clarence Alton Arnold, Albert Allen Arnold, Thomas Monroe Arnold, Maxine Arnold McAndrews, Charles Milton Arnold and Mable Etoile Arnold. In 1983, Mable Etoile Arnold died intestate and her interest in the property was inherited by Mable’s mother and siblings.
¶ 4. In May 1986, Ola fell and broke her hip. Following her release from the hospital, Ola moved in with her daughter, Myrtle Arnold Lauderdale. Three sitters were hired to take care of eighty-nine-year-old Ola, who was bedridden and required twenty-four hour care. Each sitter was paid $700 a month.
¶ 5. In November 1986, Myrtle became unable to care for her mother, and alternative arrangements were considered. Tom lived in Round Rock, Texas, where he had a water well drilling business. Albert worked with Tom in Texas. Lorene lived in Michigan with her terminally ill husband. Maxine lived in Natchez. Apparently, the other siblings chose not to participate in the decision and/or to contribute to Ola’s care.
¶ 6. After Ola expressed her desire to live with Albert, an agreement was reached by Tom, Lorene, Maxine and Albert that (1) Albert would move from Tex *982 as to Laurel to care for Ola; (2) Albert and Ms wife, Marie Christine, would live with Ola in a rental house in Laurel; (3) the rental payments would be made from a checking account established by the siblings to pay the necessary expenses for Ola’s care; and (4) one of the three sitters hired previously to care for Ola would be discharged and Albert’s wife, Marie, would assume the third sitter’s shift and pay. Marie was a certified nurse assistant.
¶ 7. Subsequently, Maxine located a rental house in Laurel and paid the first month’s rent. A checking account was opened at Bank of Laurel with Tom and Albert designated as signatories. The account was established using $27,000 of Ola’s money. Ola’s monthly Social Security check and SSI benefits (totaling $400) were deposited into the account. Additionally, the proceeds from the sale of timber from the 120 acres allocated to Ola, Tom, Lorene, Albert and Maxine would be used for Ola’s care.
¶ 8. Relying on the above agreement, Albert and Marie moved from Texas to Laurel in January 1987. Albert testified it initially cost about $3,000 a month to care for Ola, which amount included the salary for the three sitters and the rental payment.
¶ 9. On August 3, 1987, Ola signed a document giving Albert a general power of attorney so Albert could handle her business affairs. Albert testified that he contacted an attorney in Laurel and provided the attorney with the necessary information to prepare the power of attorney. Albert acknowledged Ola never met or talked with the attorney. A notary public came to the house to witness Ola sign the document. Albert paid the attorney from the account set up for his mother’s care.
¶ 10. On August 12,1987, Tom requested the Bank of Laurel remove his name from the account used to pay Ola’s expenses. Tom testified he was concerned he would be held personally liable if Albert wrote a bad check. The Bank of Laurel closed the account and forwarded the remaming funds ($95.80) to Albert. Albert opened another account into which Ola’s Social Security checks and SSI benefits were deposited and from which he paid Ola’s expenses.
¶ 11. During the summer of 1987, timber was cut from the 120 acres to provide funds for Ola’s care. In addition to Ola’s share of the funds, Albert and Maxine contributed their portions ($4,900 each) immediately into Ola’s health care account. Lorene was slower contributing her $4,900. Tom contributed a total of $4,800 over a six-month period.
¶ 12. In September 1987, Ola was hospitalized when she choked while eating. Thereafter, Ola received nourishment through a feeding tube. Albert testified Ola could not walk on her own, but was in general good health. Ola depended on others totally to take care of her personal needs. A home health nurse would examine Ola once or twice a week.
¶ 13. Tom testified that, after she broke her hip, Ola’s mental and physical abilities decreased substantially. To buttress his argument that Ola’s mind was failing, Tom testified that his mother refused to talk when he visited her every three to six months. When she would talk, she would answer his questions in monosyllables.
¶ 14. According to Albert, Ola was alert mentally. She could talk “as much as she wanted to.” She would tell Albert and Marie when she needed assistance turning in bed. Moreover, she would fuss “[a]bout the kids not coming to see her, anything else hurting her, and the doctors didn’t give her the right pills.... Chewed me out because I didn’t do what she told me to do.”
¶ 15. Patsy Myrick testified she saw no change in her grandmother’s mental capabilities when Ola attended Myrtle’s funeral in November 1987.
¶ 16. Realizing the funds were getting low, Albert discharged the two outside sitters, and Albert and Marie assumed the *983 care of Ola in October 1987. Costs of caring for Ola were cut to $1,500 a month. According to Albert’s testimony, Ola was aware that the money was running out and that Marie was not compensated for her services in caring full-time for Ola. Ola initiated the idea of giving her one-ninth undivided interest in the 120 acres to Marie as compensation. The record shows Ola insisted on the conveyance to Marie after only Albert and Maxine contributed their portion of the timber sale funds to her care, and she was not sure Lorene or Tom would do the same. Ola knew she had a fractional interest in the property, and expressed her desire to deed her interest to Marie as compensation for her services.
¶ 17. Acting on his mother’s instructions, Albert contacted the attorney about preparing a deed and provided him the necessary information. Ola never talked with the attorney about the deed. On January 21, 1988, Albert executed a quitclaim deed as attorney-in-fact for Ola conveying Ola’s interest in the 120 acres to Marie in payment for Marie’s services.
¶ 18. Marie began working outside the home in November 1988 in addition to caring for her mother-in-law. Albert took care of his mother’s business affairs and her personal needs while Marie was at work. No sibling assisted Albert and Marie in meeting the continuous physical needs of Ola from October 1987 until her death.
¶ 19. Ola died intestate February 2, 1991. Her children living at the time of her death were Albert Allen Arnold, Clarence Alton Arnold, Charles Milton Arnold, Maxine Arnold McAndrews, Thomas Monroe Arnold, and Lorene Arnold Hanson.
¶ 20. Tom and Lorene filed this action in March 13, 1996, in the Chancery Court of Scott County alleging Albert and Marie exerted undue influence on Ola Arnold to secure a power of attorney and ultimately her property by the execution of a quitclaim deed conveying the property to Marie.
¶ 21. At the conclusion of the trial, the chancellor found (1) that a fiduciary relationship existed between Albert and Marie, as caregivers, and Ola; (2) that the burden shifted to Albert and Marie to prove by clear and convincing evidence that Albert and Marie acted in good faith, that Ola deliberated thoughtfully before naming Albert as her attorney-in-fact, and that Ola acted independently in consenting to and acting upon the conveyance; (3) that Albert and Marie met the burden of proof by clear and convincing evidence; (4) that Tom contributed $4,800, his share of the timber sale money to his mother’s care; (5) that Ola Arnold required continuous care and was physically disabled, being fed through a feeding tube during the period of time in which care was given by Marie Arnold; and (6) that Marie Arnold was not paid for her services for a period of forty months. Consequently, the chancellor rendered judgment in favor of Albert and Marie declaring the conveyance of the one-ninth undivided interest in the 120 acres in Scott County to Marie Arnold to be valid.
¶ 22. Tom and Lorene appealed asserting the order of the chancellor was against the overwhelming weight of the credible evidence. We affirm finding the opinion and findings of the chancellor are supported by the facts and law.
ARGUMENT AND DISCUSSION OF THE LAW
¶ 23. “The Court employs a limited standard of review on appeals from chancery court.” Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997). “If substantial credible evidence supports the chancellor’s decision, it will be affirmed.” Id. (citing Carrow v. Carrow, 642 So.2d 901, 904 (Miss.1994)). “The Court will not interfere with the findings of the chancellor unless the chancellor was manifestly wrong, clearly erroneous or a wrong legal standard was applied.” Reddell, 696 So.2d at 288 (citations omitted). The chancellor, being the only one to hear the testimony of *984 witnesses and observe their demeanor, is the sole authority for determining the credibility of the witnesses-. Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993). This Court will not replace the chancellor’s judgment with its own. Id. Thus, this Court must examine the entire record and accept
that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court’s findings of fact....
Cotton v. McConnell, 435 So.2d 683, 685 (Miss.1983).
¶ 24. We now consider the chancellor’s findings of fact and conclusions of law to determine whether a rational trier of fact would conclude Albert and Marie overcame the presumption of undue influence by clear and convincing evidence. Mullins v. Ratcliff, 515 So.2d 1183, 1193 (Miss.1987).
DID ALBERT ARNOLD AND MARIE ARNOLD OFFER SUFFICIENT CLEAR AND CONVINCING EVIDENCE TO OVERCOME THE PRESUMPTION OF UNDUE INFLUENCE?
¶25. It is undisputed that Albert and Marie occupied a fiduciary or confidential relationship with Ola. Ola lived with Albert and Marie for approximately four years. Ola was totally dependent upon them for her personal needs. Albert and/or Marie arranged for and transported Ola to doctor appointments, paid her bills, obtained prescription medicine and necessary personal items for Ola, bathed Ola, washed her clothes, cleaned her surroundings, changed her linens, turned her to prevent bedsores from developing, administered her medication and maintained her feeding tube.
¶ 26. The existence of such a fiduciary or confidential relationship gives rise to the presumption of undue influence. Vega v. Estate of Mullen, 583 So.2d 1259, 1263 (Miss.1991). To overcome the presumption, Albert and Marie, as the proponents of the general power of attorney and thé quitclaim deed, were required to present clear and convincing evidence that they acted in good faith, that Ola had full knowledge' and deliberation of precisely what she was doing and its consequences when she executed the general power of attorney, and that Ola showed independent consent and action when she expressed her desire to convey her interest in the real property to Marie. Madden, 626 So.2d at 619, 621.
¶ 27. Tom and Lorene argue the general.power of attorney executed by Ola Arnold on August 3, 1987, in which she designated Albert as her attorney-in-fact, was procured through the exercise of undue influence by Albert and Marie and that the chancellor’s finding that Albert and Marie had overcome the presumption of undue influence is against the overwhelming weight of the evidence.
Specifically, the chancellor found
Ola Arnold obviously trusted Albert and Marie, in that she requested that she be allowed to live with them, as opposed to others. She gave Arnold the general power of attorney, which showed some trust and repose in him, certainly. There is no evidence that she ever complained about any treatment they rendered to her. There is no evidence that any of her other children ever tried to provide any services for her or to take care of her needs or to provide care and maintenance. Everything, in fact, that was done for her during those four years was done by Albert and Marie.
¶ 28. A careful review of the record supports the chancellor’s finding. Albert testified that his mother had mentioned her desire to have Albert named as her attorney-in-fact to enable him to handle her business affairs shortly after Albert moved from Texas to live with Ola. He did not act on her request, however, until several months later. Albert procured an attorney to prepare the general power of attorney and supplied the necessary informa *985 tion to the attorney. Because Ola was bedridden, Albert arranged for a notary public to witness Ola signing the document at home. Nothing in the facts indicates overreaching or bad faith on the part of Albert and Marie in procuring the general power of attorney.
¶ 29. We now consider Tom and Lorene’s contention that the quitclaim deed executed by Albert in his capacity as Ola’s attorney-in-fact which conveyed Ola’s one-ninth interest in 120 acres of real property in Scott County to Marie, Albert’s wife, should be declared invalid. To rebut the presumption that Albert and Marie exercised undue influence to persuade Ola to convey the fractional interest, the evidence presented must have shown by clear and convincing evidence that (1) Albert exhibited good faith in his fiduciary relationship with Ola; (2) Ola acted with knowledge and deliberation when she requested Albert to convey the property to Marie in January 1988; and (3) Ola exhibited independent consent and action in requesting the conveyance. Murray v. Laird, 446 So.2d 575, 578 (Miss.1984), as modified in Mullins, 515 So.2d at 1193. Applying this test, this Court must determine whether the chancellor’s finding that Albert and Marie had successfully rebutted the presumption of undue influence was manifestly erroneous and against the overwhelming weight of the evidence. In the instant case, the record contains sufficient proof to satisfy each of the three prongs: good faith, full knowledge, and independent consent and action.

(a) Good Faith.

¶ 30. To determine whether a grantee/beneficiary has acted in good faith the Mississippi Supreme Court suggested that the following factors be considered: (a) the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration was paid, if any, and (d) by whom paid, and (e) the secrecy and openness given the execution of the instrument. Murray, 446 So.2d at 578.
¶ 31. As recited above, the quitclaim deed was signed by Albert as Ola’s attorney-in-fact. The deed conveyed Ola’s one-ninth interest in 120 acres in Scott County to Marie Arnold, Albert’s wife. Albert readily admits he contacted the same attorney who prepared the general power of attorney and furnished the information necessary to prepare the quitclaim deed. However, he insists Ola initiated the idea of conveying her fractional interest in the property in lieu of the wages promised to Marie. The attorney was paid out of the account set up for Ola’s expenses. Albert did not tell his siblings that Ola wanted to convey her interest in the property to Marie before he executed the deed on Ola’s behalf because “[Ola] told me not to discuss nothing with nobody about nothing.”
The chancellor found
While the execution of the power of attorney on August 3, 1987, by Ola Arnold, in favor of Albert Arnold, coupled with the execution of the Quitclaim Deed by Albert Arnold as attorney in fact for Ola Arnold, in favor of his wife, the Grantee, Marie Arnold, on January 21, 1988, may raise an appearance of impropriety, the evidence, taken as a whole, does not establish any overreaching or bad faith on the part of Albert or Marie Arnold.
¶32. Looking as we must at the evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court’s findings of fact, we find the record supports the chancellor’s finding that the evidence, taken as a whole, fails to establish any overreaching or bad faith on the part of Albert or Marie Arnold.
¶ 33. Albert and Marie moved from Texas to Laurel to live with Ola with the understanding that Marie would replace one of the sitters and be paid $700 a *986 month. Seven months later, Albert and Marie assumed the full-time care of Ola. Marie was paid no wages for forty months. Although Tom visited Ola for a few hours approximately every three to six months, Tom testified he never assumed Ola’s care during a visit.
¶ 34. What we have gleaned from the record are facts concerning Albert’s good faith in dealing with Ola’s business affairs throughout the four years Albert and his wife cared for Ola, which tends to lend credibility to his good faith in executing the quitclaim deed. According to the testimony, Tom and Albert were the signatories on a checking account into which funds were deposited for Ola’s care; however, only Albert wrote checks on the account. Tom testified he wanted his name removed from the bank account set up for his mother’s care because he was concerned Albert might write hot checks. Claims by Tom that Albert and Marie were misusing the funds were unsubstantiated by the record. Approximately $3,000 a month was expended for Ola’s care from May 1986 until September 1987. Initially, three sitters were hired to care for Ola. When Albert and Marie moved from Texas to Laurel, one of the sitters was discharged, and Marie assumed her shift and pay. As the money ran out, Albert and Marie discharged the remaining two sitters and became Ola’s primary caregivers. Thereafter, monthly expenses were decreased to $1,500, and Marie acquired outside employment to generate income. Albert took care of Ola during the hours Marie worked.
¶ 35. There is conflicting testimony in the record regarding the amount of money deposited into the bank account. Albert testified funds available for Ola’s care during the four year period were $45,000. Tom claimed the figure was closer to $65,-000. Using the $65,000 and dividing it by the forty-seven months Ola lived with Albert and Marie, we calculate a monthly total of $1,383 was available to expend on Ola’s behalf. Of course, $65,000 was not deposited into the account as a lump sum. Albert had to manage the funds to ensure there would be money to meet Ola’s needs until her death. Undoubtedly, Albert would have had opportunities to disgorge the bank account on any number of occasions had he ever decided to do so, but he never did. Instead, Albert took care of his mother until she died in February 1991.
¶ 36. Likewise, Marie’s actions withstand Tom and Lorene’s accusation of bad faith. Marie was paid for only seven months of the forty-seven months she cared for Ola. At a minimum, Marie was owed $700 for 40 months or $28,000; at a maximum, Marie was owed $2,100 for 40 months or $84,000. Realizing she had no other assets, it was reasonable for Ola to request Albert to convey her one-ninth interest in the 120 acres to Marie in exchange for Marie’s services worth between $28,000 and $84,000.
¶ 37. Tom and Lorene assert Albert, as Ola’s agent, was not “at all times loyal and faithful to the interests of his principal, Ola Arnold” when he signed the quitclaim deed conveying Ola’s interest to his wife, Marie. Certainly, Albert was being loyal and faithful to Ola’s interests when he carried out Ola’s instructions to convey her one-ninth interest in the property to compensate Marie for taking care of Ola’s personal needs.
¶ 38. We agree with the chancellor’s finding that Albert and Marie met their burden of proof with respect to the first prong on the Murray test.

(b) Full Knowledge.

¶ 39. In determining Ola’s knowledge at the time of Albert executed the quitclaim deed, the Murray court suggested four factors be considered: (a) Ola’s awareness of her total assets and their general value, (b) an understanding by her of the persons who would be the natural inheritors of her bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural *987 distribution, (c) whether non-relative beneficiaries would be excluded or included, and (d) finally, knowledge of who controls her finances and business and by what method, and if controlled by another, how dependent the grantor is on him and how susceptible the grantor is to his influence. Murray, 446 So.2d at 579.
¶40. Whether Ola knew her financial situation and had the mental capacity to instruct Albert to deed her interest in the property to Marie were questions of fact for the chancellor to decide.
The chancellor opined:
In the opinion of the Court, the evidence has established, by clear and convincing evidence, that [Ola Arnold] was aware ... that Marie was to be paid; that there was no money available to pay her; that [Marie] was not, in fact, being paid; that [Ola] desired to compensate Marie for the services that she was rendering.
¶ 41. The only testimony offered that Ola was mentally incapacitated was given by Tom. Tom based his assertion that Ola was incapable of knowing her financial condition or the consequences of her actions in deeding her interest in the property to Marie on the fact that Ola would not carry on a conversation with him when he visited about once every three to six months. Ola would only answer his questions in monosyllables.
¶ 42. The chancellor also heard testimony from Patsy Myrick, who stated that when she saw her grandmother in February 1987 she noticed no change in her mental capacity. According to Albert and Marie, Ola would talk with them frequently. She would express discomfort, when she needed to be turned, whether she needed to see a doctor, etc. Ola knew the money was running out and that Marie had not been paid for caring for her. Albert testified Ola would talk with E.C. McAndrews, Ola’s son-in-law who visited with Ola frequently, and the home health nurse, who checked her weekly.
¶ 48. It is undisputed that Ola was totally dependent on Albert and Marie for her personal needs. In holding that Ola was capable of understanding that the money was running out, that Marie had not been paid the money she was owed and that Ola determined to convey the property to Marie in exchange for the services being provided by Marie, the chancellor obviously gave greater weight to the testimony of Albert, Marie and Patsy than he gave to Tom’s testimony.
The trial judge saw these witnesses testify. Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demean- or. He was there on the scene. He smelled the smoke of battle. He sensed the interpersonal dynamics between the lawyers and the witnesses and himself. These are indispensable.
Culbreath v. Johnson, 427 So.2d 705, 708 (Miss.1983). The chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is the sole authority for determining the credibility of the witnesses. Madden, 626 So.2d at 616. The second prong of the Murray test was satisfied.

(C) Independent Consent and Action.

¶ 44. The chancellor gave substantial weight to Albert’s testimony that Ola expressly voiced her knowledge that she knew the money to be used for her maintenance was running out, that the timber had been sold and that some of her children did not want to participate in the expense of her care and maintenance. Further, the chancellor found that it was “logical and understandable” that Ola desired to compensate Marie by conveying to Marie her interest in the Scott County property. Based on the foregoing, the chancellor held that Albert and Marie provided sufficient clear and convincing evidence to meet the final prong of the Murray test as modified by Mullins.
¶ 45. There is nothing in the record to indicate that at the time of the deed’s *988 preparation that Albert and-Marie manipulated Ola into transferring • the property-over to Marie.
CONCLUSION
¶ 46. “If substantial credible evidence supports the chancellor’s decision, it will be- affirmed.” Reddell, 696 So.2d at 288. We find the chancellor was not manifestly wrong, clearly erroneous nor was a wrong legal standard applied. The record contains evidence of sufficient quality and quantity that a rational trier of facts could have concluded (1) that Albert acted in good faith and in accordance with the wishes of Ola in serving as her attorney-in-fact and in executing the quitclaim deed; (2) that Marie acted in good faith in accepting Ola’s one-ninth interest in the 120 acre property in Scott County in exchange for her services; and (8) that Ola Arnold acted independently and with the full knowledge of the consequences of her actions when she executed the document giving Albert Arnold general power of attorney on August 3, 1987, and when ■ she insisted that Albert execute the quitclaim deed on January 21, 1988 conveying her one-ninth interest in the 120 acres in Scott County to Marie in exchange for the services being provided by Marie.
¶ 47. Accordingly, we affirm the judgment entered by the Scott County Chancery Court holding that Albert and Marie presented clear and convincing evidence to overcome the presumption of undue influence and that the quitclaim deed is valid.
'¶ 48. THE JUDGMENT OF THE CHANCERY COURT OF SCOTT COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANTS.
KING P.J., DIAZ, PAYNE, AND THOMAS, JJ„ CONCUR.
SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION
JOINED BY McMILLIN, C.J., COLEMAN AND LEE, JJ. IRVING, J., NOT PARTICIPATING.

. The real properly is more particularly described as follows:
The W % of the SW ¡4, Section 2, and the NE 'A of the SE 'A, Section 3, all in Township 7 North, Range 9 East, Scott County, Mississippi.