¶ 1. Phyllis Parker filed a complaint for divorce from Bob Parker on April 27, 2001. On June 3, 2002, Phyllis filed an amended complaint for divorce. In his answer to Phyllis's amended complaint for divorce, Bob admitted that Phyllis was entitled to a divorce on grounds of adultery. Thus, on August 28, 2003, the Chancery Court of Madison County granted a divorce to Phyllis on the grounds of uncondoned adultery. The only matters left for resolution then were the equitable division of marital assets, spousal support, and attorney's fees. The court entered a final judgment on January 8, 2004, and an amended final judgment on January 16, 2004. The court divided the marital assets and ordered the parties to pay their own attorney's fees.
 ¶ 2. Aggrieved by the court's division of the marital assets, Bob now appeals, raising the following five issues:
 I. DID THE TRIAL COURT ERR IN CHARGING AGAINST BOB'S SHARE OF THE MARITAL ESTATE THE PARKER AND ASSOCIATES NOTES?
 II. DID THE TRIAL COURT ERR IN FINDING THAT THE VALUE OF THE PARKER AND ASSOCIATES NOTES TO BOB WAS $244,772.10, RATHER THAN THE PRESENT CASH VALUE OF THE NOTES WHICH WAS ONLY $210,706.51?
 III. DID THE TRIAL COURT ERR IN FINDING THAT THE MORGAN KEEGAN ACCOUNT WAS A MARITAL ASSET? *Page 942 
 IV. DID THE TRIAL COURT ERR IN FAILING TO FIND THAT THE DEATH BENEFIT OF THE MORGAN KEEGAN ACCOUNT HAD A VALUE WHICH SHOULD HAVE BEEN CHARGED AGAINST PHYLLIS'S PORTION OF THE MARTIAL ESTATE?
 V. DID THE TRIAL COURT ERR IN FAILING TO CREDIT BOB WITH THE $46,500 HE PAID IN TEMPORARY SUPPORT DURING THE PENDENCY OF THE DIVORCE ACTION?
 ¶ 3. Finding no clear or manifest error in the chancellor's division of the marital assets, we affirm the judgment of the chancery court.
 FACTS ¶ 4. On January 28, 1961, while they were both still in college, Bob and Phyllis were married. A few years later, Bob became an accountant and purchased his father's accounting practice. Phyllis then began to work for Bob at his accounting firm. She continued to work for the firm for the next thirty-eight years, and she was apparently never paid any salary for her work at the firm. The accounting practice was successful, and Bob and Phyllis lived comfortably. They had three sons, and all of them became accountants like their father. Two sons, Phillip and Kenny, joined Bob at his accounting firm and eventually became partners in the firm. The oldest son, Chris, started his own practice.
 ¶ 5. Early in 2000, Bob, Phillip, and Kenny worked out an arrangement whereby Phillip and Kenny would buy out Bob's interest in the accounting firm, and Bob would pursue other interests, including an investment business Bob had begun. This buy-out agreement eventually led to litigation between Bob and Phillip and Kenny, and this buy-out agreement is the subject of one of the issues here on appeal. Thus, we will discuss more particulars of the buy-out agreement and its eventual decline into hostility among the parties below.
 ¶ 6. Then, after roughly forty years of marriage, on October 4, 2000, Bob and Phyllis separated. As noted, Bob admitted to having committed adultery, and, from the record, it appears that in April of 2001 Bob began openly cohabitating with his mistress (who is some twenty years his junior), doing such things as opening a bank account with her and living with her in a house he purchased, apparently for that purpose. As also noted above, Phyllis filed for divorce on April 27, 2001, and the court granted her the divorce on grounds of adultery on August 28, 2003. The matters of spousal support and equitable division of marital assets then became the subject of further proceedings, leading up to this appeal. Additional facts and particulars will be incorporated into our discussion below.
 LEGAL ANALYSIS
I. DID THE TRIAL COURT ERR IN CHARGING AGAINST BOB'S SHARE OF THE MARITAL ESTATE THE PARKER AND ASSOCIATES NOTES?
 ¶ 7. Bob argues that the notes he held as part of the buy-out agreement with Kenny and Phillip were worthless and uncollectible at the time of the division of the marital assets and that, since these notes were worthless, they should not have been credited against him. Phyllis argues that Bob's own wrongful conduct in failing to comply with the terms of the buy-out agreement caused the notes to be uncollectible, and Phyllis argues further that the chancellor was not manifestly in error in finding that Bob's conduct respecting *Page 943 
the notes constituted a dissipation of marital assets that should have been credited against Bob.
 STANDARD OF REVIEW ¶ 8. We employ a deferential standard of review in considering challenges to the findings of a chancellor. Pursuant to this standard of review, we will not reverse a chancellor's findings unless they are manifestly or clearly erroneous or unless an erroneous legal standard was applied. Southerland v.Southerland, 875 So.2d 204, 206 (¶ 5) (Miss. 2004); Fisher v.Fisher, 771 So.2d 364, 367 (¶ 8) (Miss. 2000); Chamblee v.Chamblee, 637 So.2d 850, 859 (Miss. 1994). All of the subsequent issues challenge various findings of the chancellor in his division and/or valuation of the marital assets; thus, our standard of review for all of the issues in this appeal will be the same. Because of this, we will not include a separate recitation of the standard of review under each separate issue; instead, we simply declare at the outset that we review all of the issues in this appeal under the clear/manifest error standard applicable to a chancellor's findings. Id.
 DISCUSSION ¶ 9. The record demonstrates that Bob desired to leave his accounting practice in order to focus on an investment business he had begun developing. Because of this, as noted above, he worked out a deal with his sons, Kenny and Phillip, whereby Kenny and Phillip would buy Bob's share of the accounting business for $310,000. The agreement called for a one time payment of $100,000 and installment payments thereafter of roughly $2000 per month for five years and roughly $1300 per month for ten years. The installment portion of the buy-out was evidenced by two promissory notes in the amount of $100,000 and $110,000. Also, as part of this agreement, Bob executed a non-compete agreement, specifically vowing not to actively pursue his old clients in an attempt to woo them away from Kenny and Phillip. After receiving a number of payments, Kenny and Phillip began to suspect that Bob was violating the non-compete agreement. Upon confirmation that Bob was violating the non-compete agreement, they instituted a breach of contract suit against Bob and began making subsequent payments under the notes into the registry of the court.
 ¶ 10. In settlement of this lawsuit, Kenny and Phillip agreed to dismiss their suit and forgo their contractual claim for ten times annual billings of any clients who left the firm at Bob's instigation in exchange for a cancellation of the promissory notes. In the words of the chancellor, "[i]n essence, Bob traded in these notes for the ability to continue to work as a CPA and to establish [his own accounting practice]." Thus, the chancellor found that the reason the notes became no longer payable was because of Bob's violation of his non-compete agreement with Kenny and Phillip. That is to say, if Bob had not purposefully violated his non-compete agreement, he would have continued to receive payments of roughly $2,000 per month for five years and roughly $1,300 per month for ten years (meaning that he would have received roughly $3,300 combined per month for five years and roughly $1,300 per month for five years thereafter), but, due to his own actions, he had to forfeit the right to receive this income. The chancellor found this to constitute dissipation of marital assets that should be credited against Bob.
 ¶ 11. We do not find there to be any clear or manifest error in this conclusion. Our review of the record demonstrates that Bob chose to violate the contract, being fully aware of what he was doing as *Page 944 
well as the contractual penalty for violation of the non-compete agreement (ten times annual billings for any client who left at Bob's instigation). Whether Bob was motivated by an underestimation of his sons' willingness to sue to enforce their rights or by some other reason, we cannot say, but we can say, based upon our review of the record, that Bob willfully violated the contract, and in so doing, he destroyed a definite stream of income. The chancellor said that this constituted dissipation of marital assets, and we can find no manifest error in that conclusion.
 ¶ 12. This issue is meritless.
II. DID THE TRIAL COURT ERR IN FINDING THAT THE VALUE OF THE PARKER AND ASSOCIATES NOTES TO BOB WAS $244,772.10, RATHER THAN THE PRESENT CASH VALUE OF THE NOTES WHICH WAS ONLY $210,706.51?
 ¶ 13. Bob argues that the chancellor also erred in his valuation of the notes discussed above. He argues that the proper value should have been present cash value (at the time of the division of the marital assets), as opposed to pay out value. Phyllis argues that Bob cites no authority for this issue and that, further, there was no manifest error in the chancellor's valuation.
 DISCUSSION ¶ 14. We find that this issue is meritless for two reasons. First, Phyllis is correct in her argument that Bob cites no authority to support the proposition that the value should have been present cash value as opposed to pay out value. Issues on appeal that are unsupported by citations to authority need not be considered by this court. Jones v. Howell, 827 So.2d 691, 702 (¶ 40) (Miss. 2002). Thus, Bob's failure to cite any authority in support of this argument could, by itself, render this issue meritless.
 ¶ 15. Second, in any event, we can find no clear or manifest error in the chancellor's findings on this issue. The pay out value was the actual value that Bob would have received, had he not breached the non-compete agreement, and the chancellor chose this number, at least in part to fully account for Bob's dissipation of marital assets (see the discussion under issue I. above). We can find no clear error in the chancellor's findings on this issue.
III. DID THE TRIAL COURT ERR IN FINDING THAT THE MORGAN KEEGAN ACCOUNT WAS A MARITAL ASSET?
 ¶ 16. Bob argues that the money in the Morgan Keegan account was separate property of his, as opposed to marital property, because the funds used to establish this account came from an inheritance from Bob's father. He argues on that basis that it was error for the chancellor to include the Morgan Keegan account as a marital asset and to award the account to Phyllis. Phyllis argues that Bob did not prove that this account was established solely with separate assets. Phyllis argues that Bob's testimony indicates that any separate funds used to establish this particular account were indistinguishably commingled with marital assets and that, therefore, any separate assets in this account lost their character as separate due to commingling with marital assets.
 DISCUSSION ¶ 17. We find Bob's argument on this issue to lack merit. Our review of the record demonstrates that Phyllis's argument is correct. The money that Bob allegedly inherited from his father was not deposited into this particular account until roughly eight years after his father's death. In addition, testimony and other *Page 945 
evidence indicated that there were undisputably marital funds that were also deposited into the same account. Thus, based upon our review of the record, we find that any separate funds Bob may have used in this account were commingled with marital assets; therefore, they lost their character as separate assets. Stewartv. Stewart, 864 So.2d 934, 937 (¶ 12) (Miss. 2003); Bodne v.King, 835 So.2d 52, 60 (¶ 32) (Miss. 2003). This issue is without merit.
IV. DID THE TRIAL COURT ERR IN FAILING TO FIND THAT THE DEATH BENEFIT OF THE MORGAN KEEGAN ACCOUNT HAD A VALUE WHICH SHOULD HAVE BEEN CHARGED AGAINST PHYLLIS'S PORTION OF THE MARTIAL ESTATE?
 ¶ 18. Bob argues that the Morgan Keegan account has a death benefit of over $100,000 and that this death benefit did not figure into the chancellor's division of assets. Phyllis argues that the value of the Morgan Keegan account was stipulated to before trial and that Bob cannot now challenge an amount to which he stipulated. Phyllis also argues that Bob never brought to the chancellor's attention the existence of any death benefit in the Morgan Keegan account. Because of this, Phyllis argues that Bob cannot raise the issue of any alleged the death benefit for the first time on appeal.
 DISCUSSION ¶ 19. We find that Phyllis is correct in arguing that Bob did not make any arguments at the trial court level about any death benefit associated with the Morgan Keegan account. Because of this, Bob cannot raise this issue for the first time here on appeal. Educational Placement Services v. Wilson,487 So.2d 1316, 1320 (Miss. 1986); Harbin v. Chase Manhattan Bank,871 So.2d 764, 766 (¶ 6) (Miss.Ct.App. 2004); Burcham v. Burcham,869 So.2d 1058, 1061 (¶ 9) (Miss.Ct.App. 2004); Mississippi Dep'tof Transp. v. Trosclair, 851 So.2d 408, 415 (¶ 19) (Miss.Ct.App. 2003).
 ¶ 20. Therefore, Bob's arguments on this issue are also without merit.
V. DID THE TRIAL COURT ERR IN FAILING TO CREDIT BOB WITH THE $46,500 HE PAID IN TEMPORARY SUPPORT DURING THE PENDENCY OF THE DIVORCE ACTION?
 ¶ 21. Bob argues that he should have been given credit for the $46,500 in temporary spousal support he was required to pay Phyllis during the pendency of the divorce action. Phyllis argues that Bob cites no authority in support of this contention and because of that, the issue need not be considered by this Court. Phyllis also argues that temporary alimony is not a marital asset that must be taken into consideration in making equitable distribution.
 DISCUSSION ¶ 22. Phyllis is correct that Bob cites no authority in support of his arguments on this issue; therefore, this issue lacks merit for that reason alone. If temporary alimony should have been taken into consideration in the equitable distribution, Bob has given us no authority to support that conclusion. As noted above, such a failure to cite to authority can render an issue on appeal meritless. Jones, 827 So.2d at 702 (¶ 40). Since Bob cites no authority in support of his argument, we find this issue to be without merit.
 CONCLUSION ¶ 23. Although not included in his statement of the issues, Bob also argues *Page 946 
that the court should have taken Phyllis's inheritance expectation into account in making equitable distribution. This argument plainly lacks merit. As Phyllis correctly points out, an expectancy of inheritance is not an asset. Bayless v.Alexander, 245 So.2d 17, 19 (Miss. 1971). Moreover, even if the chancellor accepted that Phyllis was certain to inherit something (a conclusion that could not reasonably have been made), it would be impossible to assign any value to that expectancy. Thus, Bob's arguments about Phyllis's expected inheritance from her father plainly lack merit.
 ¶ 24. Finally, Bob also contends that the court did not adequately apply the Ferguson factors, specifically arguing that the chancellor failed to properly consider the needs of the parties for financial security and that Bob has been left without the means to provide for himself. Bob argues that the marital home should be sold and the proceeds divided in order to remedy this problem. Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994). Phyllis argues that Bob, in essence, is improperly asking this Court to conduct a de novo consideration of the Ferguson
factors. Phyllis also argues that there was no clear or manifest error in the chancellor's division of the marital assets.
 ¶ 25. We find Bob's arguments in this regard to be plainly meritless. We decline to re-weigh and re-consider the chancellor's findings on the Ferguson factors. Bob has not demonstrated that the chancellor committed any clear or manifest error that would cause us to seriously question the chancellor's findings, much less consider reversal in this case.
 ¶ 26. Therefore, we find from our review of the record that the chancellor's findings regarding the division and valuation of the marital assets are not manifestly wrong or clearly erroneous. Because of that, we affirm the judgment of the chancery court.
 ¶ 27. THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY ISAFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THEAPPELLANT.
KING, C.J., BRIDGES, P.J., IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ. CONCUR. LEE, P.J., NOT PARTICIPATING.