# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00045-SCT

*JOE M. BOWEN*

*v.*

*BETTY CAROL BOWEN*

DATE OF JUDGMENT:                     12/07/2006
TRIAL JUDGE:                          HON. SANFORD R. STECKLER
COURT FROM WHICH APPEALED:            HARRISON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:               CLEMENT S. BENVENUTTI
ATTORNEY FOR APPELLEE:                THOMAS WRIGHT TEEL
NATURE OF THE CASE:                   CIVIL - DOMESTIC RELATIONS
DISPOSITION:                          AFFIRMED - 05/22/2008
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE SMITH, C.J., CARLSON AND DICKINSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Joe and Betty Bowen were granted a divorce on the ground of irreconcilable differences. Unable to agree upon an equitable division of property, the Bowens filed a consent to adjudicate all other disputes in the Chancery Court for the First Judicial District of Harrison County. Aggrieved by the chancellor's judgment on these remaining issues, Joe Bowen appealed to this Court. Finding no error, we affirm the chancellor's judgment.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶2. Joe M. Bowen (Joe) and his first wife, Donna Bowen (Donna), divorced in February 1986. During their marriage, Joe and Donna had purchased the Bay View Marina in Bay St. Louis in Hancock County. Upon their divorce, Joe paid Donna one-half of the appraised value of the marina, which was $200,000, to acquire Donna's interest.

¶3. Joe and Betty Carol Rhoades (Betty) began dating and cohabiting in May 1986. Joe and his brother Don owned the Bay View Marina in partnership as J & D Enterprises. Joe and Betty lived in rental homes until Joe built a residence at the marina sometime between 1993 and 1994. After about nine years of cohabiting, Joe and Betty married on November 22, 1995. Joe and Don operated the business at the marina at the time of the marriage, with Joe owning eighty percent of the business and Don owning twenty percent. At the time of the marriage, Joe and Don were attempting to sell the marina for $1,000,000. In December 1996, the marina sold for the asking price of $1,000,000. Don was paid $200,000 cash, while Joe received $200,000 cash and a promissory note in the amount of $600,000.00. The note provided for 180 payments of $5,280.84 each, at an interest rate of 8.25%. The principal balance at the date of trial was $367,219.08. Joe and Betty had been married about thirteen months before the sale of the marina.

¶4. After the sale of the marina, Joe purchased a home where he and Betty lived until September 1998. Joe then purchased a home in Long Beach, titled in both his and Betty's names, where the couple lived until their separation on May 1, 2003.

¶5.     Betty filed her complaint for divorce in the Chancery Court for the First Judicial District of Harrison County on May 27, 2003, and requested a no-fault divorce, or, in the alternative, a divorce on the ground of habitual cruel and inhuman treatment. On June 19, 2003, Joe filed his answer, stating that the parties should be granted a divorce on the ground of irreconcilable differences.

¶6.     On June 20, 2003, Betty filed a financial statement pursuant to Uniform Chancery Court Rule 8.05 wherein she stated: (1) that her net monthly income totaled $1,099; (2) that her monthly expenses totaled $2,775; and (3) that her liabilities totaled approximately $11,000 in unpaid medical bills. Betty's financial statement did not specify the total value of all assets. Also on June 20, 2003, Joe filed his financial statement, wherein he stated: (1) that his net monthly income totaled $5,423.66; (2) that his monthly expenses totaled $3,092.80; (3) and that his liabilities included $43,000, the remaining balance on the mortgage of the marital home. Joe's financial statement also did not specify the total value of all the assets.

¶7.     On July 2, 2003, the chancellor entered a temporary order enjoining the parties from disposing of the assets. This order stated that the parties were to have joint use of the marital home, but that Joe would pay the note, taxes, and insurance on the residence. Joe was also to pay Betty's expenses and insurance. Both Joe and Betty were granted the use of their respective vehicles, although Joe was to pay the notes, taxes, and insurance on both vehicles.

¶8.     On November 20, 2003, Betty filed a motion for temporary relief wherein she alleged that Joe was not paying what he was ordered to pay and also requested a temporary restraining order barring Joe from disposing of the assets.

¶9.     On January 8, 2004, the chancellor entered a *nunc pro tunc* temporary order, wherein he ordered that Joe not dispose of the assets, granted Joe use and possession of the marital home, ordered Joe to pay the bills in his financial declaration and Betty's medical insurance, ordered Joe to pay Betty temporary alimony in the amount of $1,828 monthly, and granted the parties the use of their respective vehicles. Joe also was ordered to pay $1,828 for the month of December in monthly installments of $300 until paid in full.

¶10.    On January 21, 2004, Betty filed a motion for citation for contempt, wherein she alleged that Joe had not complied with the *nunc pro tunc* order, failing to pay all monies owed her. On February 20, 2004, Betty filed another motion for citation for contempt, again alleging that Joe had not complied with the *nunc pro tunc* order, failing to pay all monies owed her. On June 29, 2004, Betty filed a motion for contempt and for sanctions, again alleging that Joe failed to comply with the *nunc pro tunc* order and failed to answer discovery.

¶11.    On February 22, 2005, Joe filed another Rule 8.05 financial statement, wherein he stated:(1) that his net monthly income totaled $5,532.30; (2) that his total monthly expenses were $3,252; and (3) that his total liabilities included $43,000, the balance owed on the mortgage of the marital home. Again, Joe did not specify the total value of his assets. However, he listed the following: (1) a joint checking account with his son Mark containing

4

a balance of $5,442.46; (2) a joint checking/savings account with son Alan containing a savings balance of $7,337.49 and a checking balance of $1,427; (3) four Stifel, Nicolaus & Co., Inc. accounts containing a total of $110,971.55; and (4) a Scottrade, Inc. account containing 100 shares of Hancock Holding Company. Also on February 22, 2005, Joe and Betty filed a consent to adjudicate, agreeing to sign all documents for a divorce on the ground of irreconcilable differences and allowing all other issues to be decided by the chancellor.

¶12.    On February 22, 2005, Chancellor Sanford R. Steckler presided over a hearing. Joe testified that he had suffered a stroke and could not remember details well; that he had not disposed of any assets, specifically his accounts, because he had paid the court-ordered monies to Betty out of the accounts; that from the date Betty moved in with him, she had made very little money at her jobs and that he had supported her financially, as he made much more money than she did; that during the thirteen months of marriage that he owned the marina, Betty did not have an outside job and assisted him by working there, including answering the telephone, taking notes, and working with the gas hoses; and that during that year, he "did the same things that she did" and additionally worked with the boats and helped the mechanic with repairs.

¶13.    Steven Lee Rhoades (Steven), Betty's son, testified that he previously had worked at the Bay View Marina for Joe;[1] that construction had begun on the marina at the time Joe

---

[1]After the sale, the marina was renamed Pelican Cove Marina. Steven began working at the marina in October 1989 and continued working there after the sale. He was employed there at the date of trial.

bought it and had continued until the time of sale because Joe was "continuously trying to improve aspects of the facility;" that Betty "occasionally" had visited a casino, but he had no knowledge of Joe giving Betty money with which to gamble; and that he, Joe, and Don had done "basically all of" the construction work improving the marina and that Betty had picked out flooring and designed the living quarters.

¶14.    According to Lorrie Bradley (Lorrie), Betty's daughter, Betty's memory had deteriorated and Betty had injuries, arthritis, and fibromyalgia; she (Lorrie) helped care for Betty; during the time Joe and Betty were cohabiting, as well as during the time of the marriage, Betty did the housecleaning, laundry, and brought lunch to the marina; Betty infrequently went to casinos; she did not know whether Betty's casino visits occurred during cohabitation or during marriage; and Joe once took the money that Betty had won from gambling.

¶15.    Betty testified that she had held a number of jobs over the years but had never earned more than $12,000 per year in her lifetime; that she was paid for washing boats at the marina; that her pay came directly from customers or was billed by the marina, but she earned no salary, and Joe did not ask her to do any other tasks than wash the boats at the marina; that she had no assets and no retirement funds, that she also took numerous prescription drugs, and that she had suffered two strokes and one heart attack. When questioned by Chancellor Steckler concerning when Joe purchased the stock, Betty stated that Joe "bought a lot of stock during the time that he and I were living together." Betty also stated that Joe's Stifel Nicolaus accounts were purchased before the marriage and she did nothing to contribute to

6

the accumulation of those assets "other than working for [Joe]," and that the accounts were created "anywhere between the late '80s, '90s, and probably still up till today." The chancellor then recessed the hearing until a later date.

¶16. On April 21, 2005, Joe filed a motion for substitution of counsel, which Chancellor Steckler granted. On May 16, 2005, Joe, by and through counsel, filed a motion for a continuance to allow Joe's new counsel more time to review the case. The chancellor heard and denied this motion on May 17, 2005.

¶17. On May 20, 2005, the hearing resumed. During the testimony of Michael Rhoades (Michael), Betty's son, Joe's counsel objected to Michael's testimony concerning asset accumulation during cohabitation. Chancellor Steckler overruled the objection, stating that "[c]ourts in Mississippi view the acquisition of assets during cohabitation prior to marriage [in] the way you would decide the assets of a partnership." Michael stated that after Joe and Betty married, Joe had added three floor levels to the west side of the building at the marina, including the residence and a new store where Betty worked; and that the three stories were added in 1998 or 1999, which was after the marina was sold.

¶18. The hearing was again recessed and resumed on May 23, 2005, at which time Betty resumed her testimony via cross-examination. Betty stated that Joe had done all of the construction work on the marina, but some work had been done prior to the marriage and some work had been done subsequent to the marriage; that during the thirteen months of marriage that Joe owned the marina, Joe had completed the boat dock, storage shed, and the living quarters; that she had assisted Joe in laying tile and refinishing cabinets in the living

7

quarters; that she had no knowledge of the amount of money in Joe's retirement accounts and she did not know if those accounts were acquired prior to the marriage; that Joe had included her lawn care services at the marina on his income tax returns; that when she had gambled with her children, they had given her the money to spend at the casinos; that when she had gambled with Joe, he had given her money to spend and he had taken the winnings; that she was in the early stages of Alzheimer's disease and had memory problems; that she and Joe had lived at the marina prior to and during the marriage and her work at the marina did not change after she married Joe; that Joe had never shown her any documentation revealing when he purchased his accounts and she did not know when he bought them; and that she did not have total recall as to when the buildings were erected at the marina.

¶19. Victoria Frisbie testified that Betty was currently an employee of her business, the Carpet Furniture Deal, and that Betty was going to be terminated because she could no longer interact with customers and fellow employees appropriately due to her memory problems.

¶20. Rivers Singleton testified that he opened a boat brokerage business in the Bay View Marina in 1990 and ran the business for about a year. Singleton testified that the buildings at the marina were about ninety percent finished in 1991. However, Singleton also stated that he believed Joe and Betty married in 1990.

¶21. Charles Benvenutti ("Benvenutti") Joe's certified public accountant, testified that he had handled Joe's financial affairs since 1987; that through 1992, there were $242,759.53 in capital improvements to the property; that in 1993, $7,000 of construction was done on the buildings; that in 1994, $4,000 was invested in the buildings; that at the end of 1994, a

8

total of $253,786 had been spent; that in 1995, the partnership was closed out; that Joe's personal income tax return for 1996 showed that his cost basis, plus expenses of the sale of the marina, was $243,000, which included the cost of the land; that he could not tell from Joe's personal tax returns whether substantial improvements to the property were made in 1995; that the largest source of income at the marina was dry boat storage, with the next largest being sales of gas and fuel, then repairs, and finally sales of snacks; that income was also generated by putting boats into the water; that the buildings and the land had constituted about ninety-three percent of the value of the marina at the time of the sale; that assets had composed the rest of the value; that there was no goodwill value; that Joe and Betty's 1997 joint income tax return reflected that they split the income from the Stifel Nicolaus funds, which was customary to save money on taxes, even though the income was all Joe's; that he (Benvenutti) could not tell from Joe and Betty's 2003 tax returns whether the accounts belonged to Joe or Betty; that his records reflected that there were no capital improvements to the marina in 1995 or 1996; and that an April 14, 1994, financial statement prepared for the People's Bank for a loan against the marina valued the land and improvements to the marina at $1,000,000.

¶22.   Joe testified that he had used his mechanical engineering degree and purchased the marina in 1971; that he had bought adjoining property and changed the design and operation of the marina; that he had built three buildings at the marina; that the first building had been completed before his divorce from his first wife, Donna; that the second and third buildings had been in the process of being constructed; that all services the business offered were

9

available with the completion of the first building; that boat storage was the most profitable aspect of the business, generating sixty-five-to-seventy percent of the gross income and eighty-five-to-ninety percent of net profits; that the second building was completed between 1987 and 1988, and all of the boat storage space was completed with the second building; that he believed Betty's boat-cleaning business was in operation during the marriage; that prior to the marriage, Betty had no specific duties or hours at the marina; that he did not remember Betty assisting him by laying tile, but she instead had swept the floor and handed him tools; that he had never had a joint bank account with Betty, and none of Betty's money from her other jobs had ever gone into his accounts; that he did not remember what year his profit-sharing plan was started and he could not say how much money was in his retirement plan prior to the marriage in 1995; that the money that went into the retirement plan was from Joe's salary and profits at the marina; and that he had given Betty $130,000 over a period of six to seven years for her to invest for their retirement, but that Betty had told him the money "evaporated." Joe further testified that the "biggest majority" of the assets in the Stifel Nicolaus and Scottrade accounts had been acquired before the marriage; that he "didn't make any investments during the marriage because the money went to" Betty instead to invest for their retirement, and he did not know what had happened to money; that he had never taken Betty's winnings at the casino, but he did pay taxes on her winnings; that he had given Betty money pending the court proceedings to pay her health insurance because the court ordered him to pay her health insurance, but Betty had failed to pay her premiums and her policy was canceled; that Betty did not have specific assignments at the marina, but

10

instead she had simply acted on her own, doing what she thought needed to be done; that in the thirteen months during the marriage that he owned the marina, Betty had continued doing the work around the marina that she had done during cohabitation; and that Joe's tax returns in 1995 reflected he paid taxes on $10,770 that Betty had won at a casino. Also, when asked whether he had provided discovery information concerning when the accounts had been acquired and how much money was in these accounts, Joe testified that he believed he had collected the necessary documentation with his original attorney concerning the Stifel Nicolaus and Scottrade accounts.

¶23. Betty again testified, stating that Joe had never given her approximately $130,000 and that she had nothing left from her gambling winnings.

¶24. On October 25, 2005, Joe filed a motion for modification and other relief, asking the trial court to reduce his temporary monthly payments to Betty because Hurricane Katrina had damaged the Bay Marina and destroyed the marital residence. Joe, upon request by the new owners of the Bay Marina, and without consulting Betty, had reduced the amount paid on the note to interest only due to their difficulty with cash flow. The record does not reveal that the chancellor ever ruled on this motion.

¶25. On December 6, 2005, the chancellor entered a judgment of divorce, finding, *inter alia*, that Joe and Betty were married on November 22, 1995, after about nine years of living together, and separated on May 1, 2003. The chancellor further stated:

> 8. Now, in retrospect, the Court sees two older citizens, who have health problems, who have memory problems, and who come before the court requesting more help than the court can give. The parties did not produce

11

enough documentary evidence to be of much assistance to the Court with respect to their respective earnings and accumulation of assets during cohabitation before and after marriage. Having read the evidence, my notes, the briefs of the parties, and particularly the cases of Ferguson, Hemsley, and Bunyard, the Court finds that certain equitable adjustments have to be made because assets were acquired during marriage, others were co-mingled, and Mrs. Bowen had a reasonable expectation that they were merging everything together to last both of them the rest of their lives. The Court further finds that Joe Bowen owned the marina prior to the marriage. However, during the marriage he used income from the marina operations and from other sources to improve the marina substantially, and Mrs. Bowen did give some assistance in helping to make the improvements. Joe also devoted much of his own time, labor and talent to the marina improvements during the marriage. It is the opinion of this Court that the improvements and increased value of the marina resulting from those improvements made during the marriage are marital assets.

The chancellor granted Joe and Betty a divorce on the ground of irreconcilable differences, and awarded Betty one-half of the insurance proceeds from the marital home which was destroyed in Hurricane Katrina; ownership and possession of the vehicle she drove; and ten percent of each of Joe's financial accounts. The chancellor furthered ordered Joe to pay Betty $430 per month in rehabilitative alimony for five years, to pay Betty's outstanding medical bills, and to pay $2,000 of Betty's attorney's fees.

¶26. On December 15, 2005, Betty filed a motion to reconsider, stating the chancellor either improperly relied upon the information in Joe's post-hearing motion or, in the alternative, simply failed to grant Betty enough alimony to meet her needs. Joe filed his response on February 24, 2006.

¶27. On September 14, 2006, Betty filed yet another motion for citation for contempt and other relief, alleging that Joe did not meet his financial obligations pursuant to the judgment

12

of divorce. Betty filed a corrected motion for citation for contempt and other relief on October 19, 2006, correcting errors in the previous filing.

¶28. On December 7, 2006, Chancellor Steckler entered an order granting Betty's motion to reconsider, specifically stating that no changes in the parties' circumstances due to Hurricane Katrina were considered. Additionally, the chancellor found that Betty "was entitled to share in the increased value of the marina resulting from the improvements made during the marriage." The chancellor addressed the *Armstong* factors,[2] finding: (1) that Joe's financial statement did not adequately disclose the value of his investments, including the marina, and that both parties' living expenses were approximately $3,000 per month; (2) that both parties were in poor health; (3) that Joe had the funds to meet his monthly expenses while Betty did not; (4) that the marriage had lasted a total of ten years; (5) that no children had been born of the marriage; (6) that at the time of the divorce, Joe was 71 years old and Betty was 65 years old; (7) that the parties had had a modest living arrangement during the marriage and that, at the time support was set, Joe's monthly gross income was $5,190 after paying temporary alimony to Betty, while Betty's gross monthly income was $3,297, including temporary alimony; (8) that the court had received no evidence of tax consequences of the support decree; (9) that no fault or misconduct of the parties had been considered because the parties entered into a consent to adjudicate on the ground of irreconcilable differences; (10) that Betty had gambled; and (11) that Betty could not be

---

[2] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280-81 (Miss. 1993).

13

compensated for the period of cohabitation. The chancellor found that Betty was "entitled to lump sum alimony in the amount of $60,000.00, an amount equal to ten percent of Joe's mortgage note of $600,000.00." Joe was to pay thirty payments of $2,000 each until paid in full.

¶29.    The chancellor also awarded Betty half of the equity in the marital home or insurance proceeds from any damage due to Hurricane Katrina, and he further found that Betty had a partial ability to pay her attorney's fees due to the equitable distribution of property, and thus awarded her $2,000. All other provisions of the judgment of divorce previously entered but not discussed in the order, including ordering Joe to pay Betty's outstanding past medical bills and to give Betty ten percent of his financial accounts, remained in full force and effect.

¶30.    Joe then timely filed his Notice of Appeal.

**DISCUSSION**

¶31.    We must consider five issues: (1) whether the chancellor erred in determining that the promissory note from the sale of the marina was marital property; (2) whether the chancellor erred in his characterization of the IRA and stock brokerage accounts as marital assets; (3) whether the chancellor erred in calculating the percentage of the promissory note as a marital asset; (4) whether the chancellor erred in failing to give Joe credit for payment of temporary rehabilitative alimony and prior lump-sum alimony payments; and (5) whether the chancellor erred in making no adjustment for dissipation of marital assets from Betty's gambling. As we discuss these issues, they will be restated for the sake of clarity.

14

¶32.   "This Court employs a limited standard of review of property division and distribution in divorce cases." **Owen v. Owen**, 928 So. 2d 156, 160 (Miss. 2006) (quoting **Reddell v. Reddell**, 696 So. 2d 287, 288 (Miss. 1997)). "This Court has repeatedly stated that the chancellor's division and distribution will be upheld if it is supported by substantial credible evidence." **Id.** (quoting **Carrow v. Carrow**, 642 So. 2d 901, 904 (Miss. 1994)); *see Owen I*, 798 So. 2d at 397-98). "The 'chancery court has authority, where equity demands, to order a fair division of property accumulated through the joint contributions and efforts of the parties.'" **Id.** (quoting **Savelle v. Savelle**, 650 So. 2d 476, 479 (Miss. 1995)); *see also* **Hemsley v. Hemsley**, 639 So. 2d 909, 914 (Miss. 1994). "This Court will not substitute its judgment for that of the chancellor 'even if this Court disagrees with the lower court on the finding of fact and might [arrive] at a different conclusion.'" **Id.** (quoting **Owen I**, 798 So. 2d at 397-98; **Richardson v. Riley**, 355 So. 2d 667, 668 (Miss. 1978)).

¶33.   "In **Carrow**, 642 So. 2d at 904, citing **Bell v. Parker**, 563 So. 2d 594, 596-97 (Miss. 1990), this Court stated that the chancellor's findings will be upheld unless those findings are clearly erroneous or an erroneous legal standard was applied. However, the Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." **Id.**; *see* **Sandlin v. Sandlin**, 699 So. 2d 1198, 1203 (Miss. 1997); *see also* **Carrow**, 642 So. 2d at 904; **Bell**, 563 So. 2d at 596-97.

I.   **WHETHER THE CHANCELLOR ERRED IN DETERMINING THAT THE PROMISSORY NOTE FROM THE SALE OF THE MARINA WAS MARITAL PROPERTY.**

¶34.   Joe argues that the record lacks substantial evidence to show that the promissory note

15

was a marital asset. Further, Joe argues that the trial court made findings of fact in its original judgment of divorce and in its order granting the motion to reconsider that are not supported by the evidence. Specifically, Joe cites certain findings by the chancellor:

1. Joe Bowen used income from his marina operations and other sources to improve the marina substantially during the marriage.
2. Mrs. Bowen gave some assistance during the marriage in helping to make improvements to the marina project.
3. An increased value of the marina resulted from improvements made during the marriage.
4. Joe's financial declaration did not disclose his investments or the value of the marina.
5. The parties did not provide enough documentary evidence to be of much assistance to the court regarding respective accumulations of assets during cohabitation, before and after marriage.

¶35. Joe argues that "Betty presented no testimony to show any increase in the value of the Bay View Marina from the date of the marriage, November 22, 1995, to the date of the sale in December of 1996." The property was on the market before the marriage at the price of $1,000,000; the property sold for the listing price. Joe's tax returns do not reflect any capital improvements during 1995 or 1996; Joe completed the capital improvements in 1994. Thus, according to Joe, the chancellor's finding that Betty was entitled to ten perecent of the promissory note due to improvements in the property during the thirteen months that Joe and Betty were married before the sale of the marina is clearly erroneous and is arbitrary and capricious.

¶36. On the other hand, Betty argues that Chancellor Steckler did not award her a portion of the promissory note; instead, he awarded Betty "lump sum alimony in the amount of $60,000.00, *an amount equal to* 10% of Joe's mortgage note of $600,000.00." (Emphasis

16

added). Betty further argues that the chancellor found that she made some contributions to the marina that entitled her to this lump-sum alimony. Additionally, Betty states that "[w]hether family use or commingling or simply her contribution to the increase of value in the marina, [she] acquired an equitable interest in the marina and promissory note."

¶37. Joe, in his reply brief, argues that it is apparent that the chancellor created marital property from separate property in order to wrongly compensate Betty for the period of cohabitation.

¶38. Where a party commingles non-marital assets or uses them for familial benefit, those assets become marital assets. *Johnson v. Johnson*, 650 So. 2d 1281, 1286 (Miss. 1994). Clearly, after the marriage, Joe and Betty lived and worked at the marina. Thus, the chancellor did not err in finding that Betty was entitled to share in the benefit of the marina note. This issue is without merit.

## II. WHETHER THE CHANCELLOR ERRED IN HIS CHARACTERIZATION OF THE IRA AND STOCK BROKERAGE ACCOUNTS AS MARITAL ASSETS.

¶39. Next, Joe argues that the chancellor erred in granting Betty a ten percent interest in his accounts where the chancellor did not specifically find that the accounts were marital property. Further, Joe argues that the trial testimony clearly shows that he made no contributions to the accounts during the marriage and that Betty never made any contributions to the accounts. Additionally, no evidence was presented at trial as to any increase or decrease in the value of the accounts throughout the marriage. Thus, according

17

to Joe, the chancellor erred as no evidence substantiated equitable distribution of the accounts, because the accounts were titled solely in Joe's name and were never commingled.

¶40.    Betty argues that, contrary to Joe's argument in this appeal, Joe testified that "[t]he biggest majority of it was before the marriage" when asked whether the accounts were accumulated before or during the marriage.  Further, Joe failed to answer and supplement discovery questions concerning the accounts.

¶41.    The chancellor decides whether an asset is marital or non-marital utilizing the *Hemsley* factors.  ***Johnson v. Johnson***, 650 So. 2d 1281, 1287 (Miss. 1994).  Marital property is defined as "any and all property acquired or accumulated during the marriage." Domestic services and economic services have equal value.  ***Hemsley v. Hemsley***, 639 So. 2d 909, 915 (Miss. 1994).  Assets classified as marital property are equitably divided utilizing the ***Ferguson***[3] factors, taking into account the parties' non-marital assets. ***Johnson***, 650 So. 2d at 1287.

¶42.    "Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of 'the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation.'" ***Sproles v. Sproles***, 782 So. 2d 742, 747 (Miss. 2001) (quoting ***McKee v. Flynt***, 630 So. 2d 44, 47 (Miss. 1993); ***Rainey v. Rainey***, 205 So. 2d 514, 515 (Miss. 1967)).  Thus, the

---

[3] ***Ferguson v. Ferguson***, 639 So. 2d 921 (Miss. 1994).

chancellor acted well within his discretion, based upon the evidence presented, in determining that Betty was entitled to a portion of the accounts. This issue is without merit.

### III. WHETHER THE CHANCELLOR ERRED IN CALCULATING A PERCENTAGE OF THE PROMISSORY NOTE AS A MARITAL ASSET.

¶43. Joe argues that Betty would be entitled to share in any increase in the value of the marina which occurred only during the thirteen months of marriage in which he owned it. Further, Joe argues that he owned the marina for twenty-five years prior to selling it, and he was married to Betty for only a little more than a year of that time period. Joe also points out that the face value of the note at the time of the order granting the motion to reconsider was far less than the original face value of $600,000. Accordingly, Betty is entitled only to one-half of one twenty-fifth interest of the current value of the marina note, and the chancellor's finding that Betty was entitled to ten percent of the face value of the marina note is unsupported by the evidence.

¶44. Again, the chancellor did not award Betty a portion of the promissory note as a marital asset. Rather, the chancellor awarded Betty lump-sum alimony in the amount of $60,000. This issue is without merit.

### IV. WHETHER THE CHANCELLOR ERRED IN FAILING TO GIVE JOE CREDIT FOR PAYMENT OF TEMPORARY REHABILITATIVE ALIMONY AND PRIOR LUMP-SUM ALIMONY PAYMENTS.

¶45. Joe argues that the chancellor was clearly erroneous in failing to give him credit for temporary rehabilitative alimony payments paid between December 2003 and December

19

2005 and lump-sum alimony payments paid between December 2005 and December 2006. Further, Joe argues that the chancellor's use of the face value of the marina note rather than the diminished value from the payments is arbitrary and capricious. Joe directs this Court to *Ory v. Ory*, 936 So. 2d 405 (Miss. Ct. App. 2006).

¶46.    Joe fails to direct this Court to case law stating that temporary support should be considered in equitable distribution; therefore, this issue is procedurally barred. *Parker v. Parker*, 929 So. 2d 940, 945 (Miss. 2005) (citing *Jones v. Howell*, 827 So. 2d 691, 702 (Miss. 2002)). Further, as discussed *supra*, the chancellor awarded lump-sum alimony rather than a portion of the note as a marital asset; thus, the chancellor was free to exercise his discretion in equitable distribution, which was not arbitrary and capricious. This issue is without merit.

### V.    WHETHER THE CHANCELLOR ERRED IN MAKING NO ADJUSTMENT FOR DISSIPATION OF MARITAL ASSETS FROM BETTY'S GAMBLING.

¶47.    Joe argues that the chancellor erred by failing to make an adjustment to Betty's award after finding that Betty had gambled. However, the chancellor did not find that Betty wasted or dissipated the marital assets; he simply found that she gambled. Again, the chancellor, as the trier of fact, determines the weight and credibility to assign the evidence. *Sproles*, 782 So. 2d at 747. Thus, this issue is without merit.

### CONCLUSION

¶48.    For the foregoing reasons, the judgment of the Chancery Court for the First Judicial District of Harrison County is affirmed.

20

¶49.　**AFFIRMED**.

　　**SMITH, C.J., WALLER AND DIAZ, P.JJ., DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**