# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00300-COA

LACEY WHITTINGTON                               APPELLANT

v.

BENJAMIN WHITTINGTON                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/17/2021 |
| TRIAL JUDGE: | HON. JOSEPH PRESTON DURR |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT S. ADDISON |
| | MATTHEW THOMPSON |
| | CHAD KENNETH KING |
| ATTORNEY FOR APPELLEE: | KELLEY MITCHELL BERRY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/07/2023 |
| MOTION FOR REHEARING FILED: | |

EN BANC.

WILSON, P.J., FOR THE COURT:

¶1. As part of the parties' divorce decree, the chancellor ordered Lacey Whittington (Lacey) to reimburse Benjamin Whittington (Ben) for having used his separate property to pay off her student loans of $125,879.89. Lacey argues that the chancellor abused his discretion by ordering the reimbursement. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Ben and Lacey were married in 2010 in Copiah County. At the time, Lacey worked as a nurse. In 2012, Lacey moved to Birmingham to pursue a master's degree so that she could become a certified registered nurse anesthetist (CRNA). While in school, Lacey used student loans to cover her tuition and living expenses in Birmingham. Ben continued to live

in Copiah County, where he was employed.

¶3. Lacey graduated in 2014 and moved back to Copiah County. In July 2014, she began working as a CRNA with an annual salary of approximately $148,000. At the time, Ben was working at a trucking company with an annual salary of approximately $40,000. The parties had two daughters born in 2015 and 2018.

¶4. In September 2016, Ben sold an annuity he had received prior to the marriage as part of a settlement related to an eighteen-wheeler accident.[1] He deposited the proceeds in a joint account and used $125,879.89 to pay off Lacey's student loans. The parties had decided that Ben should sell the annuity to pay off Lacey's student loans, which they thought would allow them to live more "comfortably" and buy a home. Ben used additional proceeds from the annuity to buy and remodel a home for the couple.[2]

¶5. In February 2021, Lacey filed a complaint for a divorce, and Ben answered and counterclaimed for divorce. Later that year, the parties consented to an irreconcilable differences divorce. They agreed to share joint legal custody and that Lacey would have physical custody of their daughters. The parties agreed to allow the chancellor to determine Ben's visitation schedule and all issues related to the division of the marital estate.

---

[1] Ben testified that when he was fifteen years old, he was struck by an eighteen-wheeler while helping a man change a tire on the side of the interstate. The specific terms and payment schedule of the annuity that Ben sold are not clear from the record. Ben testified that the annuity "was going to pay out over 1.2 million [dollars]" in the future before he sold it for approximately $440,000 or $450,000.

[2] Ben also used some of the proceeds to start a trucking business, which later went out of business.

¶6.     Following a trial on the contested issues, the chancellor entered an opinion and final judgment.  The chancellor found that all the parties' assets were marital except for Lacey's engagement ring and Ben's remaining annuity.[3]  The chancellor found that the marital assets and debts had a net value of approximately $284,000, which the chancellor divided evenly.  The majority of Lacey's award consisted of her 401(k) account, valued at $144,569.67.  Citing *Guy v. Guy*, 736 So. 2d 1042, 1047 (¶19) (Miss. 1999), the chancellor also ordered Lacey to reimburse Ben for using his annuity to pay off her student loans.  The judgment provided that Lacey could reimburse Ben by either (1) making monthly payments of $1,050 plus 3.5% interest for 120 months or (2) transferring $125,879,89 from her 401(k) account to Ben within six months.  If Lacey elected to make monthly payments, her payments would be reduced by Ben's child support obligation of $685 per month.

¶7.     Lacey filed a motion to amend the judgment or for a new trial, which was denied in relevant part, and a notice of appeal.  On appeal, Lacey argues that the chancellor abused his discretion by ordering her to reimburse Ben for his payoff of her student loans.

**ANALYSIS**

¶8.     "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review."  *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003).  "This Court will not disturb the chancellor's opinion when supported by substantial evidence

---

[3] Ben has an additional annuity from the eighteen-wheeler settlement that will pay him $2,500 per month beginning at age fifty.

unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Id.* at 819 (¶53). On issues of law, our standard of review is de novo. *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009). As it relates to the division of the marital estate, we "review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Wells v. Wells*, 800 So. 2d 1239, 1243 (¶8) (Miss. Ct. App. 2001). Likewise, "[w]hether or not to award alimony and the amount of alimony is largely within the discretion of the chancellor. We will not disturb the award on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error." *Id.* at 1244 (¶9).

¶9.     In *Guy*, the Mississippi Supreme Court addressed the issue of how a professional degree should be treated in the division of marital property. *Guy*, 736 So. 2d at 1043 (¶6). In that case, while the wife (Audra) obtained a nursing degree, the husband (Rob) paid the majority of the couple's bills, including Audra's tuition and other expenses. *Id.* at 1046 (¶17). Rob estimated that he spent a total of $35,000 in support of Audra's nursing degree. *Id.* at 1043, 1046 (¶¶3, 18). Audra filed for divorce less than a month after she obtained her degree. *Id.* at 1046 (¶17). In the equitable division of the marital estate, the chancellor treated Audra's nursing degree as a marital asset and, based on Rob's testimony, assigned it a value of $35,000. *Id.* at 1042-43 (¶¶2-3). Audra appealed, arguing that the chancellor erred by treating her degree as a marital asset. *Id.* at 1043 (¶5).

¶10.   On appeal, the Supreme Court held "that professional degrees are not marital

4

property" and cannot "be divided or assigned" in the division of marital property. *Id.* at 1044

(¶10). Therefore, the Court reversed the chancellor's ruling on that issue. *Id.* at 1046-47

(¶¶17, 20). However, the Court also

> recognize[d] the potential inequity of a situation . . . where one spouse works full-time to put the other spouse through school where they obtain a college degree. After obtaining this degree at the expense and sacrifice of the supporting spouse, the supported spouse leaves the supporting spouse with nothing more than the knowledge that they aided their now ex-spouse in increasing his/her future earning capacity.

*Id.* at 1044 (¶11) (citing *Mahoney v. Mahoney*, 453 A.2d 527, 533-34 (N.J. 1982)). In

addition, the Supreme Court reasoned,

> **Marriage should not be a free ticket to professional education** and training without subsequent obligations. One spouse ought not to receive a divorce complaint when the other receives a diploma. Those spouses supported through professional school should recognize that they may be called upon to reimburse the supporting spouses for the financial contributions they received in pursuit of their professional training. And they cannot deny the basic fairness of this result.

*Id.* at 1045-46 (¶13) (ellipsis omitted) (quoting *Mahoney*, 453 A.2d at 535).

¶11. In *Guy*, the Supreme Court held that "Rob's estimate" of what he spent in support of

Audra was "insufficient" to support an order requiring Audra to reimburse Rob. *Id.* at 1046

(¶18). But the Court remanded the case with instructions that if Rob presented "proper

proof," the chancellor could award "reimbursement alimony" or "lump-sum alimony" in an

amount that "would adequately reimburse Rob for his expenditures towards Audra's attaining

her nursing degree." *Id.* at 1046-47 (¶¶15, 19-20). The Court also noted that "Audra's

argument that the $35,000 consisted of housing, food, and clothing expenses in addition to

5

books and tuition [was] irrelevant." *Id.* at 1046 (¶16). The Court "recognize[d] that it takes more than books and tuition money to attend school and obtain a higher education. Housing, clothing, and food must also be paid for in order to attend a university." *Id.*

¶12. In the present case, the chancellor found that "[t]here is ample evidence of Ben directly contributing to the nurse anesthetist education and training of Lacey in the amount of $125,879.89, which dramatically increased her future earning capacity." Citing *Guy*, the chancellor also found that although Lacey's degree was not marital property, Lacey should reimburse Ben for his contributions to her education and increased earning capacity. On appeal, Lacey argues that *Guy* is factually distinguishable and that its reasoning is inapplicable here. Lacey primarily relies on two factual differences between *Guy* and the present case. First, in *Guy*, the wife filed for divorce less than a month after obtaining her degree, whereas Lacey filed for divorce about six-and-a-half years after she obtained her degree and about four-and-a-half years after Ben paid off her student loans. Essentially, Lacey argues that Ben has no claim to reimbursement because Ben benefitted from her degree and increased earnings for a period of time prior to the divorce. Second, Lacey points out that the Guys were only married for about three years and had no children, whereas Lacey and Ben were married for about ten years and have two children.[4]

_____

[4] Lacey also cites her testimony that some of her student loans were used to pay expenses related to the couple's home in Copiah County, but her testimony on this point was equivocal and insufficient to establish this claim. At one point, Lacey testified that her student loans were used to cover "some" unspecified expenses related to the Copiah County home. But later she testified that her own tuition, books, and living expenses in Birmingham

¶13. We conclude that the chancellor did not manifestly err or abuse his discretion in ordering reimbursement because Ben presented "proper proof" that he made direct financial contributions to Lacey's education and a degree that will substantially increase her earning capacity for many years to come. *Guy*, 736 So. 2d at 1047 (¶19). Unlike the husband in *Guy*, Ben did benefit from Lacey's increased earnings for a time. But in *Guy*, the Supreme Court emphasized that a "contributing spouse should be entitled to some form of compensation for the financial efforts and support provided to the student spouse *in the expectation that the marital unit would prosper in the future* as a direct result of the couple's previous sacrifices." *Id.* at 1044 (¶10) (emphasis added) (quoting *In re Marriage of Weinstein*, 470 N.E.2d 551, 557 (Ill. 1st Dist. App. Ct. 1984)). The Court also reasoned that a "remedial award" may be proper because "[t]he supporting spouse's sacrifices would have been rewarded *had the marriage endured and mutual expectations of both of them been fulfilled.*" *Id.* at 1045 (¶11) (emphasis added) (quoting *Mahoney*, 453 A.2d at 534). The supporting spouse's "expectation" is that the marriage will "endure" and "prosper" for more than just a few years. But in this case, Lacey filed for divorce while the couple's two daughters were still

equaled or exceeded her student loans. Ben worked throughout the marriage, and Lacey acknowledged that Ben's income was used to pay expenses related to the Copiah County home. Moreover, Ben testified that he earns enough money to pay his own household expenses. He testified that he did not recall Lacey's student loans being used to help pay Copiah County bills, although "it could have happened." Thus, the dissent's assertion that "it is undisputed Lacey paid the majority of the couple's bills while she pursued her degree and during the entirety of the marriage" (*post* at ¶23) requires clarification. The parties both testified that Lacey *physically wrote the checks* to pay bills throughout the marriage, not that she was the primary breadwinner while she was in school.

young—five and two years old, respectively. Surely, when Ben paid off Lacey's student loans in the amount of $125,879.89, he did not "expect" the marriage to end so soon.

¶14. The dissent argues that this case is distinguishable from *Guy* because "no one walked out on anyone," and "Ben and Lacey agree[d] to a divorce on the ground of irreconcilable differences." *Post* at ¶24. However, these facts do not distinguish the case from *Guy*. In this case, the parties agreed to an irreconcilable differences divorce only after Lacey filed for divorce and then moved out. In *Guy*, the parties likewise agreed to an irreconcilable differences divorce after Audra moved out. *Guy*, 736 So. 2d at 1042, 1046 (¶¶1, 17).

¶15. The dissent also asserts that the chancellor ordered too much of a reimbursement because Ben "fully realized the expectation of achieving a higher standard of living" during the "many years [he and Lacey] continued to be married" after she obtained her degree. *Post* at ¶25 (quotation marks omitted). However, six years is not "many years." In addition, it was not Ben's "expectation" that Lacey would file for divorce only four years after he had paid off her student loans totaling $125,879.89.

¶16. Moreover, in another respect, Ben has a *more compelling* equitable claim to reimbursement than the husband in *Guy*. The husband in *Guy* supported his wife's education only with what he earned while working during the marriage. *Id.* at 1046 (¶17). By definition, such earnings are *marital* property. *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994). In contrast, Ben paid off Lacey's student loans by selling an annuity that indisputably was Ben's *separate* property. Had Ben not sold the annuity, it would have

8

remained his separate property and would not have been subject to equitable division in the divorce. Under these circumstances, the chancellor did not abuse his discretion by finding that Lacey should reimburse Ben for liquidating his own separate property in order to pay off her student loans.

## CONCLUSION

¶17. As stated above, we "review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Wells*, 800 So. 2d at 1243 (¶8). In the present case, the chancellor followed the Supreme Court's on-point decision in *Guy* and did not abuse his discretion by ordering Lacey to reimburse Ben for paying off her student loans.

¶18. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE AND EMFINGER, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, LAWRENCE AND SMITH, JJ.; WESTBROOKS, J., JOINS IN PART.**

**McCARTY, J., DISSENTING:**

¶19. That Ben could receive reimbursement for the costs of Lacey's student loans is undisputed—but since their marriage lasted six years after the loan was paid off, to require her to repay the full amount was an abuse of discretion. Because their family realized a higher standard of living after Lacey's education, I respectfully dissent.

¶20. The majority correctly articulates the general thrust of *Guy*—that a supporting spouse

9

may be entitled to reimbursement for contributions made during marriage, such as student loan payments. *Guy v. Guy*, 736 So. 2d 1042, 1046 (¶14) (Miss. 1999). But the majority overlooks two key points from that case—one express and one implied. The first is that reimbursement may be awarded to the supporting spouse "where the contribution was made with the expectation of achieving a higher standard of living for the family unit, and the couple *did not realize that expectation* due to divorce." *Id.* at (¶15) (emphasis added) (quoting *Hoak v. Hoak*, 370 S.E.2d 473, 477-78 (W. Va. 1988)).

¶21. The second is that *Guy* grappled with a wife leaving her husband "within a month" of receiving her degree, which the Supreme Court clearly saw as inequitable. *Id.* at (¶17). Plus the couple was married less than three years and had no children. *Id.* at 1042 (¶1). For those few months, the husband paid the majority of the bills while the wife pursued her nursing degree, including paying for her tuition and other expenses. *Id.* at 1046 (¶17). The wife left her husband "within a month" of obtaining her nursing degree. *Id.*

¶22. In contrast, Ben and Lacey were married nearly eleven years. They had two daughters, one of whom was born two years after Ben voluntarily paid off Lacey's loans. And while Ben used some of the money to pay off her loans, the couple made the decision to do so *together*, to benefit their family. When Ben was asked during trial why he chose to sell the annuity, he said he wanted to "give us a better life where we didn't have to, you know, struggle[.]" This wasn't Lacey scamming her way out of student loan debt; this was a young couple trying to get ahead.

10

¶23. It is worth pointing out that it was Lacey who took out student loans on her own accord to pay for her tuition and living expenses while getting her master's in nursing. While the testimony was vague as to whether some of her loans were used to pay expenses related to the couple's home in Mississippi, it is undisputed Lacey paid the majority of the couple's bills while she pursued her degree and during the entirety of the marriage. She was also the one who made payments on her student loans for two years prior to the couple's decision to use the proceeds from the annuity. The couple remained married for four and a half more years after her student loans were paid off, bought a house, remodeled it, and even had their second child.

¶24. So the facts of this case are readily distinguishable from *Guy*. Of course the couple in *Guy* could not "realize the expectation of achieving a higher standard of living"—the wife walked out on her spouse "within a month" of receiving her nursing degree. But here, no one walked out on anyone. They remained together after Lacey's student loans were paid off for four and a half more years. And in those years, the couple had their second child, bought a house, and remodeled the house. Only then did both Ben and Lacey agree to a divorce on the grounds of irreconcilable differences.

¶25. Given the proof in this case it is inequitable to require Lacey to pay back every single cent, when Ben himself testified this was "to give us a better life"—and where it did, for the many years they continued to be married and start their family. This is the opposite of the fly-by-night marriage in *Guy*. This couple fully realized the "expectation of achieving a

11

higher standard of living" for their family.

¶26.     Given these marked differences, it was an abuse of discretion for the trial court to order Lacey to pay Ben $125,879.89.  We should reverse, and upon remand the trial court should consider these distinctions in achieving a more equitable solution.[5]

**McDONALD, LAWRENCE AND SMITH, JJ., JOIN THIS OPINION. WESTBROOKS, J., JOINS THIS OPINION IN PART.**

---

[5] While not the central focus of her argument,  Lacey touched upon the theory that Ben voluntarily commingled the proceeds from his annuity.  "Assets which are classified as non-marital, such as inheritances, may be converted into marital assets if they are commingled with marital property or utilized for domestic purposes." *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶20) (Miss. 2002); *see also Parker v. Parker*, 929 So. 2d 940, 944-45 (¶¶16-17) (Miss. Ct. App. 2005) (holding any separate funds a husband put into an investment account were "indistinguishably commingled with marital assets" and "lost their character as separate due to commingling with marital assets").

The proof at trial showed Ben voluntarily put the money from his annuity into the couple's joint checking account.  The couple used that money not just to pay off Lacey's student loans but also to buy a house, a new car, start Ben's business, and pay for all other living expenses.  Therefore, the funds were "indistinguishably commingled with marital assets" and could be seen as having lost their character as separate assets.

12